UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEATRIZ TIJERINA, individually,<br><br>Plaintiff,<br><br>v.<br><br>ALASKA AIRLINES, INC.,<br>an Alaska Corporation; and DOES 1–50,<br><br>Defendants. | Case No.: 22-CV-203 JLS (BGS)<br><br>**ORDER: (1) OVERRULING PARTIES' EVIDENTIARY OBJECTIONS; (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; AND (3) SUSTAINING PLAINTIFF'S OBJECTION TO DEFENDANT'S SUPPLEMENTAL BRIEFING**<br><br>(ECF Nos. 34, 38-7, 43-2 & 57) |

Presently before the Court are Defendant Alaska Airlines, Inc.'s ("Defendant" or "Alaska") Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment ("MSJ," ECF No. 34), Plaintiff Beatriz Tijerina's ("Plaintiff") Opposition thereto ("MSJ Opp'n," ECF No. 38), and Defendant's Reply in support thereof ("MSJ Reply," ECF No. 43). Also before the Court are Plaintiff's Notice of Errata ("Errata," ECF

/ / /

/ / /

No. 39), which includes two declarations inadvertently omitted from her Opposition;[1] Plaintiff's Evidentiary Objections to Defendant's MSJ ("Pl.'s Evid. Objs.," ECF No. 38-7); Defendant's Reply to Plaintiff's Evidentiary Objections (ECF No. 43-2); and Defendant's Evidentiary Objections to Plaintiff's MSJ Opposition ("Def.'s Evid. Objs.," ECF No. 43-1). The Court heard oral argument on May 25, 2023, at which time the Court granted Defendant permission to file a brief containing supplemental authorities, *see* ECF No. 52; therefore, also before the Court are Defendant's Supplemental Briefing Regarding Punitive Damages ("Def.'s Supp. Br.," ECF No. 55) and Plaintiff's Objection ("Supp. Br. Obj.," ECF No. 57) and Response (ECF No. 58) thereto.

Having carefully considered the Parties' arguments, both in their briefing and at oral argument; the evidence; and the law, the Court **OVERRULES** the Parties' Evidentiary Objections, **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment, and **SUSTAINS** Plaintiff's Objection to Defendant's Supplemental Briefing, for the reasons set forth below.

# BACKGROUND

## I. Factual Background

In or around July 2017, Plaintiff began working as a part-time customer service agent ("CSA") for Virgin America. Declaration of Tiffany Tran Madison in Support of Defendant's MSJ ("Tran MSJ Decl.," ECF No. 34-1) Ex. A (Beatriz Tijerina Deposition Transcript ("Pl. Depo. Tr.—Tran," ECF No. 34-2)) at 24:6–11.[2] As a CSA, Plaintiff's customary job duties involved checking in customers and working at the gate and baggage claim areas. *Id.* at 24:14–18. Plaintiff became an employee of Alaska in or around April

---

[1] Defendant moved to strike these two declarations, *see* ECF No. 42; however, the Court denied that motion, *see* ECF No. 60.

[2] Citations throughout this Order to the Parties' briefing refers to the internal pagination provided by the Parties. Any citations to deposition transcripts likewise correspond to the transcript's internal pagination and line numbers. In citing to any non-deposition transcript exhibits to declarations, however, the Court cites to the pagination provided by the District's Case Management/Electronic Case Filing system, which page numbers appear in the upper righthand corner of each page.

2018, when Virgin America merged with Alaska. *Id.* at 25:8–16. She worked approximately 25 to 30 hours per week, *id.* at 27:7–10, and was a union employee, *id.* at 27:14–22. Alaska's clerical, office, and passenger service employees, which include CSAs and Lead CSAs, are represented by the International Association of Machinists and Aerospace Workers (the "Union"). *See generally* Declaration of Steven Zwerin in Support of MSJ ("Zwerin Decl.," ECF No. 34-3) Ex. M; *see also id.* at Art. 4.C.

Mark Buenaflor was a Lead CSA for Alaska who, like Plaintiff, worked at the San Diego International Airport. Pl. Depo. Tr.—Tran at 34:3–8. Plaintiff began working with Mr. Buenaflor in April 2018, when she became an Alaska employee, and worked with him almost every day she had a shift. *Id.* at 34:22–35:5.

### A.   *Harassment of Plaintiff and Reports Thereof*

Starting in April 2018, when Plaintiff became an Alaska employee, and nearly every day Plaintiff and Mr. Buenaflor worked together, Mr. Buenaflor would call Plaintiff "babe" and "sweetie." Pl. Depo. Tr.—Tran at 35:13–23, 37:12–17. In total, Plaintiff estimates that Mr. Buenaflor called her "babe" 40 to 50 times, and "sweetie" 40 to 50 times, throughout the remainder of 2018. *Id.* at 38:21–24, 39:18–21. Plaintiff never asked Mr. Buenaflor to stop calling her "sweetie" and never told him that she was offended by his use of the term with her. Declaration of Matthew H. Aguirre in Support of Plaintiff's MSJ Opposition ("Aguirre Decl.," ECF No. 38-1) Ex. 8 (Beatriz Tijerina Deposition Transcript ("Pl. Depo. Tr.—Aguirre," ECF No. 38-5) at 39:3–10.

In September 2018, while Plaintiff was sitting in the leads' office "closing out" for the day, Mr. Buenaflor "slid[] his chair over, and massage[d Plaintiff], not even telling [her], and he sa[id], 'You feel tense. Does your husband not give you a massage? You need a massage.'" Pl. Depo. Tr.—Tran at 42:5–43:7. He squeezed her shoulders with both hands for five to ten seconds, stopping when Plaintiff got up to leave. *Id.* at 45:2–46:3. In total, Mr. Buenaflor massaged Plaintiff's shoulders approximately ten or more times during the period of September 2018 through late December 2018. *Id.* at 49:20–50:23. On about four of those occasions, Mr. Buenaflor additionally remarked on how Plaintiff's shoulders

were very tense. *Id.* at 52:20–53:18. Plaintiff was "scared of [Mr. Buenaflor]," so she did not tell him that she felt his behavior was inappropriate or that she was offended by it. *Id.* at 43:12–25. She also never asked him to stop or told him that she did not want him to touch her shoulders anymore. *Id.* at 51:8–23. Getting up because it was time to leave "was always [Plaintiff's] excuse." *Id.* at 45:14–46:3. There were no witnesses to the massages. *Id.* at 50:24–51:3.

Mr. Buenaflor also touched Plaintiff's inner thigh on approximately five occasions, also during the period from September through December 2018. *Id.* at 54:9–16, 60:17–25. The first time was in September 2018 in the leads' office, while Plaintiff was sitting at the computer. *Id.* at 54:17–56:13. Mr. Buenaflor slid his chair next to Plaintiff, "put his hand—his right hand on [her] left thigh and started like caressing." *Id.* at 56:2–8. He gently rubbed Plaintiff's leg above the knee for approximately five seconds, at which point Plaintiff slid her chair away from him. *Id.* at 56:25–58:10. She did not ask Mr. Buenaflor to stop touching her thigh or tell him that she was offended and that the behavior was unwanted. *Id.* at 59:5–60:5, 64:7–20. The first thigh-touching incident happened after Mr. Buenaflor massaged Plaintiff's shoulders the first time. *Id.* at 56:17–19.

Finally, while on her break one day in December 2018, Plaintiff walked into the leads' office while eating a Rice Krispie treat. *Id.* at 67:3–68:5, 69:19–70:1. As Plaintiff was holding the last bite close to her face and about to put it in her mouth, Mr. Buenaflor "gets close to [Plaintiff] and he opens his mouth thinking—[Plaintiff] thought he was going to kiss [her] and he takes—[she] felt his lips on [her] fingers and he just takes it away from [her]." *Id.* at 67:7–14. Plaintiff, who was "just kind of shocked," immediately walked away. *Id.* at 67:14–15, 70:8–15. Neither she nor Mr. Buenaflor said anything. *Id.* at 70:2–18. No one else was present when this happened. *Id.* at 68:9–10.

Mr. Buenaflor first became aware of Plaintiff's allegations that he was harassing her sometime in 2018, as a result of "[s]tation rumor" that Plaintiff "was going to talk to HR regarding harassment." Aguirre Decl. Ex. 5 (Deposition Transcript of Mark Buenaflor ("Buenaflor Depo. Tr.—Aguirre," ECF No. 38-3)) at 152:9–21. Plaintiff first reported Mr.

Buenaflor's conduct in February 2019, when she spoke to Sebina Pizzo,[3] a Lead CSA and union shop steward, in person.  Pl. Depo. Tr.—Tran at 233:8–22.  Ms. Pizzo told Plaintiff that Plaintiff would have to report the conduct to Alaska's Human Resources department ("HR") in order to lodge a formal complaint of sexual harassment.  *Id.* at 234:1–4.  Plaintiff initially reported Mr. Buenaflor's conduct to Ms. Pizzo instead of Alaska management because she was "more comfortable with Sebina," as they had both come over to Alaska from Virgin America.  Pl. Depo. Tr.—Aguirre at 237:17–21.

Thereafter, Plaintiff was out on family and medical leave ("FMLA") for a period of approximately two and one-half months, beginning sometime in February 2019 and ending sometime in April or May 2019.  Aguirre Decl. Ex. 9; Pl. Depo. Tr.—Tran at 127:18–20, 251:21–25.

In May 2019, when Plaintiff had returned from FMLA and was in the break room, another Lead CSA, Bridgette (presumably Bridgette Lopez), tapped Mr. Buenaflor on the back, to which Mr. Buenaflor said, "Oh, that's sexual harassment.  I'm going to go report it to HR."  Pl. Depo. Tr.—Aguirre at 71:21–72:15; Aguirre Decl. Ex. 12 at 19.  Given that this occurred in the "first couple of days" that Plaintiff was back from her leave of absence after reporting Mr. Buenaflor's conduct to Ms. Pizzo, Plaintiff believed that Mr. Buenaflor knew about Plaintiff's conversation with Ms. Pizzo about his conduct, and accordingly Plaintiff found his behavior "offensive."  Pl. Depo. Tr.—Aguirre at 71:21–73:19.  Plaintiff felt like Mr. Buenaflor "put a target on [her] back" from that time until her employment with Alaska  ultimately ended.  *Id.* at 74:11–75:11.  According to Plaintiff, Mr. Buenaflor made similar comments on approximately two other occasions.  *Id.* at 243:10–44:9.

Also in May 2019, Mr. Buenaflor, while acting as a gate lead, changed Plaintiff's role mid-shift from controlling agent to boarding agent, "which you never do that"—"[y]ou actually finish the flight and then move people around."  *Id.* at 78:3–25.  Although Mr.

---

[3] Plaintiff's testimony and documents sometimes only refer to others by their first names; to the extent possible, the Court has filled in last names using those supplied elsewhere in the record.  Here, a report Plaintiff subsequently made to Alaska provides this individual's full name.  *See* Aguirre Decl. Ex. 12 at 19.

Buenaflor was standing "right there," he informed Plaintiff's coworker of this change rather than telling Plaintiff directly. *Id.* at 78:3–13. According to Plaintiff, gate leads are supposed to "mak[e] sure everything goes smooth," but only the "admin lead" is supposed to control the schedule for the day and "change people around." *Id.* at 80:1–18. Plaintiff believed Mr. Buenaflor made this improper mid-shift change because of what Plaintiff reported to Ms. Pizzo. *Id.* at 80:19–81:8.

On June 9, 2019, Plaintiff received an oral warning from her supervisor about Plaintiff's failure to "clear OS list in order," "enter SSRs at the ticket counter," and call for approval prior to sending late passengers to the gate. Pl. Depo. Tr.—Tran at 190:10–91:15. She also received a written "Notice of Discipline or Charge" the same day memorializing the oral warning. *See id.* at Ex. 13. Later in the day on June 9, 2019, Plaintiff e-mailed HR about the oral warning, which she contested. *Id.* at 196:6–9; Aguirre Decl. Ex. 6 at 3. Plaintiff's e-mail additionally inquired how to submit "a sexual harassment/harassment inquiry," noting that Mr. Buenaflor, her "direct supervisor," "would constantly be[] touchy and make [her] feel very uncomfortable. Until this day, [she] refuse[s] to go up to him if he's in the office by himself." Pl. Depo. Tr.—Tran at 198:20–199:5; Aguirre Decl. Ex. 6 at 3. This was the first time HR was made aware of Plaintiff's allegations concerning Mr. Buenaflor's conduct. Pl. Depo. Tr.—Tran at 198:20–99:5. According to Plaintiff, she waited until June 9, 2019 to report Mr. Buenaflor's conduct to HR because she "was very terrified of Mark." Pl. Depo. Tr.—Aguirre at 237:14–16. Plaintiff received an e-mail from HR Business Partner Erica Benedicto on June 10, 2019, offering to discuss Plaintiff's concerns. Pl. Depo. Tr.—Tran at 199:18–200:5.

Plaintiff sent Ms. Benedicto a subsequent e-mail on June 18, 2019, concerning Mr. Buenaflor's unwelcome shoulder massages; Mr. Buenaflor calling her "babe" and saying "disgusting remarks" like, "You're tense, you need a body massage"; and the Rice Krispie treat incident; and Plaintiff and Ms. Benedicto spoke by telephone on June 18, 2019, about these issues. *Id.* at 200:23–02:14; *see also* Aguirre Decl. Ex. 9. Plaintiff's e-mail to Ms. Benedicto indicated that Plaintiff "was scared of retribution since [Mr. Buenaflor] is [her]

supervisor"; that, "[b]efore [she] went on [her] FMLA [the CSAs] had a bid for [their] new schedule and [she] selected nights just to get away from him"; that she was "so terrified of [Mr. Buenaflor] that when [she] call[s] the office when [she] need[s] help or ha[s] a question and he's the lead [she] would rather call customer care than speak to him"; that "[her] not talking to him only makes him more upset"; and that she "feel[s] like [she] ha[s] a target on [her] back" because of Mr. Buenaflor and "his best friend," Bridgette (again, presumably Bridgette Lopez). Aguirre Decl. Ex. 9; *id.* Ex. 12 at 19.

During her June 18, 2019 telephone call with Ms. Benedicto, Plaintiff also alleged that Ms. Lopez had accused Plaintiff of "screaming at Mo," one of Plaintiff's best friends, and that that had "got[ten] to the supervisors." Aguirre Decl. Ex. 12 at 18. Plaintiff also apparently told Ms. Benedicto that she had reported to Claudia (presumably Claudia Almaraz-Richardson) that in February of 2018 Ms. Lopez had said that "all black people . . . a[re] all lazy," and that "[e]ver since then, Bridgette [Lopez] would not talk to me." *Id.* at 18, 19.

Plaintiff first lodged a formal complaint with HR about Mr. Buenaflor's comments and conduct in July 2019. Pl. Depo. Tr.—Tran at 177:12–23. An Alaska Office of Ethics & Compliance "Fact Finding Report" dated August 23, 2019, summarizes Plaintiff's allegations, outlines documents reviewed and interviews conducted, and finds the allegations unsubstantiated on that basis. *See generally* Zwerin Decl. Ex. C. The "Fact Finding Report" does not include any notations suggesting that HR obtained a written statement or witness interview from Mr. Buenaflor prior to the date of the report. *See id.* at 72. Moreover, this document indicates that Mr. Buenaflor was given an "oral warning" concerning attendance on April 13, 2019, but discloses no other discipline during his employment up to that date. *Id.* at 71.

Alaska's case file for Plaintiff's harassment report and the subsequent investigation, case AS-2019-934, notes that the investigation was opened on July 8, 2019, and closed 199 days later, on January 23, 2020, due to being "Not Substantiated" and because of "Insufficient Information." Aguirre Decl. Ex. 12 at 16–17. Under "Action taken," the case

file concludes: "No Action Necessary." *Id.* at 18.  From June 9, 2019 to November 26, 2019, Alaska obtained statements from or interviews of Plaintiff, Brooke Embernate,[4] Sebina Pizzo, Leslie Dizon, Donna McCoy, Yvette Arriaga Viveros, Debbie Tucker, Tennille Taylor, Krystal Crespo, Mark Buenaflor, Bridgette Lopez, and Claudia Almaraz-Richardson.  *Id.* at 19.  Regarding Plaintiff's complaints that Mr. Buenaflor gave her unwanted shoulder massages, took an unwelcome bite of her Rice Krispie treat, and called her "babe," the case report noted that Plaintiff "was unable to provide specific information regarding date and time" beyond "September-December"; that Mr. Buenaflor denied the behaviors; that no witnesses could substantiate the claim; and that HR spoke to Plaintiff's named witnesses to Mr. Buenaflor's inappropriate conduct—Ms. Dizon, Ms. McCoy, and Ms. Arriaga Viveros—and "there are no harassment concerns." *Id.*  The case file indicates that "HR had [an] in-person close out conversation with [Plaintiff] on 11/8/2019," at which time Plaintiff "acknowledged that she understands allegations were investigated, were determined to be either not substantiated or insufficient information, and case was now closed."  *Id.* at 19–20.  Under "Action Taken," the case file indicates that there was a November 22, 2019 "Q&A with Mark Buenaflor" and a November 26, 2019 "written statement" from Mr. Buenaflor.  *Id.* at 20.  Accordingly, other than the conclusory statement that Mr. Buenaflor denied the behavior, there is no clear indication in the case file that Alaska spoke to Mr. Buenaflor about Plaintiff's allegations prior to the "close-out" meeting with Plaintiff, and a reasonable inference could be drawn that Alaska did not do so. *See generally id.*  During her deposition, Plaintiff stated that she felt "unheard" during this process because her initial HR contact, Ms. Benedicto, did not follow up with her until "about a month or two months out" from her report.  Pl. Depo. Tr.—Tran at 115:4–23.

On July 6, 2019, there was an incident involving a "buddy pass" that Plaintiff provided to a friend named Issa for a flight to San Francisco.  *Id.* at 128:17–29:20; *id.* Ex.

---

[4] Ms. Embernate is also sometimes referred to as "Brooke Vessey" in the record.  *See* Memorandum in Support of Motion for Summary Judgment (ECF No. 34-1 at 11) at 6 n.7.

18.   The gate agent at the time was "really close to Mark [Buenaflor] and Bridgette [Lopez]." *Id.* Ex. 18.  The following day, Brooke (presumably Brooke Embernate) asked Plaintiff if she had given Issa a buddy pass, and when Plaintiff said "yes," Ms. Embernate told Plaintiff that Issa had "caused a scene and most likely we're going to go ahead and take your buddy—your flying benefits away." *Id.* at 129:5–1l; Aguirre Decl. Ex. 12 at 19. According to Plaintiff, Alaska was in the process of revoking her buddy pass privileges when she left her employment. Pl. Depo. Tr.—Tran at 130:5–10.  Plaintiff believes that Ms. Embernate spoke with a supervisor to get Plaintiff's buddy pass privileges revoked because Ms. Embernate was friends with Mr. Buenaflor and was retaliating against Plaintiff's recent report of harassment.  *Id.* at 130:14–32:20.   Plaintiff e-mailed Ms. Benedicto about the incident on July 7, 2019.  *Id.* Ex. 18.

On July 7, 2019, Bridgette (presumably Bridgette Lopez), a gate lead, tried to switch Plaintiff mid-shift, without the admin lead's sign-off, from Plaintiff's control agent duties, and when Plaintiff went to the admin lead on duty to discuss the change, Brooke (presumably Brooke Embernate), who also was a "lead/trainer," "comes in storming, starts screaming out of nowhere saying, 'You need additional training[.]'" *Id.* at 106:17–08:25; *id.* Ex. 18.  Plaintiff believed this incident occurred because Ms. Lopez, Ms. Embernate, and Mr. Buenaflor were "best friends," and after Plaintiff reported Mr. Buenaflor's conduct to HR, "[Plaintiff] felt like it was a retaliation or [she] was being watched, and it was one thing after another, and [Ms. Embernate] was one of them."  Pl. Depo. Tr.—Aguirre at 105:1–4, 106:4–15.  On July 7, 2019, Plaintiff e-mailed Ms. Benedicto about this incident. Pl. Depo. Tr.—Tran at 222:3–24; *id.* Ex. 18.  Every time Ms. Embernate was the lead gate agent, she would change Plaintiff's position "so [Plaintiff] wouldn't be interacting with [Ms. Lopez, Ms. Embernate, and Mr. Buenaflor]."  Pl. Depo. Tr.—Aguirre at 108:23–09:23.  Ms. Lopez also switched Plaintiff's role on two occasions.  *Id.* at 133:13–15.

The same investigation opened on July 8, 2019, into Plaintiff's allegations into Mr. Buenaflor's alleged harassment, also covered: (1) Plaintiff's allegations, reported by phone to Ms. Benedicto on June 18, 2019, concerning Ms. Lopez accusing Plaintiff of screaming

at Plaintiff's friend and Ms. Lopez making racist remarks; (2) the July 7, 2019 "buddy pass" incident involving Ms. Embernate; and (3) the July 7, 2019 incident involving Ms. Lopez attempting to reassign Plaintiff mid-shift. *See* Aguirre Decl. Ex. 12 at 18–19. These allegations all were found to be "not substantiated." *Id.* at 19.

Plaintiff first informed her station manager, Julie Ceron, of Mr. Buenaflor's harassment in August 2019. Pl. Depo. Tr.—Tran at 254:10–18. Ms. Ceron was not aware of Mr. Buenaflor's conduct prior to that time. *Id.* at 254:10–21. Once Ms. Ceron became aware of the allegations, she made an effort to place Plaintiff and Mr. Buenaflor away from each other even if they were on the same schedule, although there were days when Ms. Ceron was absent and they ended up working together. *Id.* at 254:22–55:7.[5]

In September 2019, when Plaintiff was standing next to fellow CSA Jeff Umali at the first-class check-in and bag drop, he told a SkyCap, Alphonso, concerning an ex-girlfriend that "[a]ll you have to do is have sex with her, use her, and she'll be coming crawling back to you." Pl. Depo. Tr.—Aguirre at 135:16–36:17; Pl. Depo. Tr.—Tran Ex. 20. Plaintiff "immediately looked at them because it was loud enough for customers to hear and not appropriate work conversation." Pl. Depo. Tr.—Tran Ex. 20. "Jeff looked at [her] and said 'that's a man[']s perspective. I'm just saying the truth.'" *Id.* Plaintiff was with a passenger at the time, and after Mr. Umali stepped away, Alphonso "c[a]me[] up to [Plaintiff] and said 'he's weird for saying that.'" *Id.*

The following day, September 15, 2019, Plaintiff was working a flight and asked Mr. Umali, the boarding agent, to make an announcement. *Id.* He refused, saying that was "her job," but the Lead CSA, Alvin Atienza, "step[ped] in and sa[id] 'that's actually the boarding agent[']s job.'" *Id.* After they all had finished their tasks, Plaintiff asked Mr. Atienza to "stick around because [she] wanted to talk with Jeff but didn't want to be alone."

---

[5] Other evidence in the record suggests that Plaintiff may have informed Ms. Ceron, and remedial efforts may have been undertaken, at an unspecified point in time earlier than August 2019, as a July 26, 2019 e-mail Plaintiff sent to Ms. Ceron "thank[ed Ms. Ceron] for all [her] help thus far" and indicated that Plaintiff had "seen a big difference in the lack of interaction with Mark." *Id.* at 226:4–27:9.

*Id.*  Plaintiff then brought up the incident from the previous day.  *Id.*  Mr. Umali told Plaintiff, "'that's my personal opinion about that,'" which prompted Plaintiff to say to Mr. Atienza, "'there you go, he admitted it.'"  *Id.*  Plaintiff pulled Mr. Atienza aside, and he "kept apologizing on [Mr. Umali's] behalf."  *Id.*  Afterwards, as they all were walking back to the counter, Mr. Umali called Plaintiff a "bitch" under his breath.  Pl. Depo. Tr.— Aguirre at 136:18–24, 139:4–24.  He also told another agent that Plaintiff was a "bitch," and that agent told Plaintiff.  *Id.* at 139:14–15.  In a contemporaneous e-mail to Ms. Ceron and others with the subject line "Harassment," Plaintiff stated that Veronica Everett told Plaintiff that Mr. Umali had said that he "[f]uc*ing hate[s] [Plaintiff]," and that he had repeated the sentiment to another individual named Paula as well.  Pl. Depo. Tr.—Tran Ex. 20.  Plaintiff reported the incident to a female lead named Magda, who told Plaintiff that she would be reporting the incident herself but also "gave [Plaintiff] some options on courses of action."  *Id.*

According to Case AS-2019-1302, Alaska opened an investigation into the incident involving Mr. Umali on September 16, 2019, and closed the case 16 days later on October 3, 2019.  *See* Zwerin Decl. Ex. I at 97.  The "reporter" of the incident is listed as "anonymous," although the case file notes that the reporter was "[d]iscovered to be SAN CSA Beatriz Tijerina."  *See id.* at 97, 99.  The incident was determined to be "Substantiated," with "Coaching" listed as the "Action taken."  *Id.* at 98.  According to the report, Plaintiff had to ask Alphonso what he and Mr. Umali were talking about and that she "did not know what they were talking about until he [i.e., Alphonso] said something to her."  *Id.* at 99.  Nonetheless, Mr. Umali "apologized and stated he was wrong for saying that comment in the workplace."  *Id.*  The report indicated that Ms. Ceron would have a discussion with Mr. Umali to "review relevant policies to set behavior expectations moving forward."  *Id.*

On September 27, 2019, Plaintiff called in to work to report that she would have to miss a shift, but Mr. Buenaflor, who was the lead on duty, "put [her] as a no-call/no-show. So [she] ended up getting an occurrence."  Pl. Depo. Tr.—Tran at 76:3–13.  After notifying

management and following "several meetings," the occurrence was corrected and taken away, and Plaintiff ultimately was not disciplined in any way as a result. *Id.* at 76:14–77:15.

On October 5, 2019, Plaintiff sent Ms. Ceron, Ms. Benedicto, and Michelle Nelson (Ms. Ceron's supervisor)[6] an e-mail with the subject line "Incident with Alvin." Pl. Depo. Tr.—Tran Ex. 21 at 100. The e-mail disclosed that the same night as the incident involving Mr. Umali—September 15, 2019—"Alvin made some pretty outrageous accusations. He told [Plaintiff] that he was told by a previous agent, that [Plaintiff] was sleeping around with another man." *Id.* Plaintiff's e-mail stated that Plaintiff confronted the person who had started the rumor (apparently an individual named "Holu" or "Hulo" or "Hula"), at which point she messaged screenshots of the conversation to Mr. Atienza. *Id.* Plaintiff said that Mr. Atienza "seemed bothered by [Plaintiff] trying to clear [her] name" and said that he would "never tell [Plaintiff] anything again." *Id.* Plaintiff's e-mail said that "[i]t seemed as though Alvin was holding this over my head and didn't want me to file a[n] HR complaint against Jeff," and she also thought that "it seems as though Alvin is well aware of the pending HR complaint [she] ha[s] against Mark." *Id.* Plaintiff noted that "Alvin is known to spread rumors and [she] would appreciate if he was talked to regarding pending HR issues and who he can talk to about them." *Id.*

Plaintiff included screenshots of her conversations with her e-mail. *Id.* at 101–03. They show that she sent Mr. Atienza a screenshot of her conversation with her friend Fernando in which she wrote, "I have a huge question, when did we ever have a kiss or ever have sex?" *Id.* at 101. He responded, "What? . . . Eso nunca paso [that never happened]." *Id.* She then writes, "Your friend []told someone here / Hulo." *Id.* at 101–02. Fernando responded, "Holu doesn't even work at the airport and honestly he is not that kind of person." *Id.* at 102. Plaintiff then wrote a message to Mr. Atienza saying, "My husband just messaged him. / Hula." *Id.* at 103. Mr. Atienza wrote back, "So now I'm

---

[6] *See* Memorandum in Support of Motion for Summary Judgment (ECF No. 34-1 at 11) at 19 n.23.

never going to say anything." *Id.* Plaintiff responded, "But I never said your name." *Id.* Mr. Atienza said, "Okay / Just remember I got your back." *Id.* According to text messages retrieved from Mr. Atienza's phone, Plaintiff responded, "I'm just here clearing my name. People like that should be called out and especially for someone who was nothing but a good friend of mine. 'Fernando' needs to know what this guy started. I'm sure you would have your wife's bk." *Id.* Ex. 22 at 104. She then wrote, "Thank you Alvin. You know I have always like[d] you and respected you. I mean, I go to []you for everything hahah and that means a lot because"—the remainder of the message is cut off. *Id.* at 105. During her deposition, Plaintiff clarified that she was "good friends" with Fernando, not Mr. Atienza. Pl. Depo. Tr.—Tran at 230:9–12. Plaintiff also stated that she thanked Mr. Atienza because "[she] didn't want to have another person [to] be watching [her] back with" and "[she] wanted to make it as smooth as possible," but "[she] knew [she] was going to make a report of him." *Id.* at 231:23–32:13. Plaintiff says she was never informed of the outcome, if any, of the investigation into these allegations. *Id.* at 232:15–18.

On November 2, 2019, Plaintiff initiated a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Tran MSJ Decl. Ex. D. During her intake interview, Plaintiff told the investigator "everything," but the fact that Mr. Buenaflor touched Plaintiff's inner thigh is not included in the intake interview notes. Pl. Depo. Tr.—Tran at 251:2–20. During her deposition, Plaintiff acknowledged that she did not tell the investigator that she had told Alaska HR personnel that Mr. Buenaflor touched her inner thigh or that he had called her "babe" beginning in April 2018. *Id.* at 253:12–54:9.

On November 7, 2019, Ms. Benedicto forwarded Plaintiff's October 5, 2019 e-mail about the incident with Mr. Atienza to Ms. Nelson. *See* Pl. Depo. Tr.—Tran Ex. 21. Case AS-2019-1540 was opened on November 12, 2019, and was closed 99 days later, on February 20, 2020. *See* Zwerin Decl. Ex. K at 103. It was determined that the incident was "Substantiated," and "Coaching" was the "Action taken." *Id.* at 104. The report noted that Mr. Atienza "acknowledged making the comment," but that he did so because he "merely wanted [Plaintiff] to be aware of the rumor" and that he "did not intend to insult

or offend Beatriz."  *Id.*  The report noted, however, that, "[a]s a Lead, Alvin is held to a higher standard and should not be discussing rumors with agents.  SAN management to counsel Alvin against discussing private lives of others at work."  *Id.*

As noted *supra*, in a November 8, 2019 meeting with managers, HR personnel, and Union representatives, Plaintiff was informed that her claims concerning Mr. Buenaflor's sexually harassing conduct had been dismissed for lack of evidence.  Pl. Depo. Tr.—Tran at 239:10–40:5; *see also* Aguirre Decl. Ex. 12 at 19.  Alaska's case file for Plaintiff's sexual harassment report indicates that Plaintiff "initially refused to meet for close-out"; only acquiesced once "GM Julie [Ceron] issued a directive"; and "was combative throughout the meeting," but acknowledged that the case was now closed.  Aguirre Decl. Ex. 12 at 19–20.  According to Ms. Ceron, although Plaintiff's complaints against Mr. Buenaflor were found to be unsubstantiated, "[she] counseled Mr. Buenaflor on Alaska's strict harassment policy and reminded him to act professionally at all times during work."  Declaration of Julie Ceron in Support of Defendant's MSJ ("Ceron Decl.," ECF No. 34-5) ¶ 13.  However, Alaska's Federal Rule of Civil Procedure 30(b)(6) witness, Steven Zwerin, stated in his deposition that he had no recollection of Mr. Buenaflor being specifically coached about sexual harassment in relation to Plaintiff's case, although he recalled seeing that Ms. Ceron had a conversation with Mr. Buenaflor in March 2019 concerning allegations made by another CSA, Donna McCoy, addressed *infra*.  Aguirre Decl. Ex. 2 (Deposition Transcript of Steven Zwerin ("PMK Depo. Tr.—Aguirre," ECF No. 38-2)) at 286:24–87:16.  And, during his deposition, Mr. Buenaflor noted that the only times he had ever been disciplined had to do with attendance, and he was never disciplined for anything else during his employment with Alaska.  Buenaflor Depo. Tr.—Aguirre at 20:12–16.  As noted *supra*, the August 2019 "Fact Finding Report" concerning Plaintiff's harassment allegations also indicates that Mr. Buenaflor's sole "oral warning" up to that date had concerned attendance and occurred on April 13, 2019.  Zwerin Decl. Ex. C. at 71.

During his deposition, Mr. Buenaflor stated that roughly a year passed between the time he first heard rumors that Plaintiff was going to talk with HR about harassment and

when he met with HR and a supervisor about her allegations. Buenaflor Depo. Tr.—
Aguirre at 154:11–17. According to Mr. Buenaflor, the meeting lasted approximately 40
minutes, and he was questioned about whether he had ever called Plaintiff "babe," whether
he had ever touched Plaintiff, and whether he ate a Rice Krispie treat from her hand. *Id.* at
154:18–62:3. He answered each question in the negative. *Id.*

On December 6, 2019, Plaintiff sent Rick Hines at Alaska an e-mail with the subject
line "Help!" Aguirre Decl. Ex. 10 at 10. She indicated a desire to talk to Mr. Hines about
"some issues that [she's] been dealing [with] here at the San Diego station and not getting
any support on." *Id.* He responded on Monday, December 9, 2019, offering to set up a
time to talk that Friday if she would be "in station" then. *Id.* She responded that she was
out of the station until December 19, 2019, but would be happy to meet up then or at any
point thereafter. *Id.* On December 10, 2019, he offered to call her to discuss her issues
earlier. *Id.* at 9–10. At some point over the following two weeks, Plaintiff sent Mr. Hines
an e-mail outlining the various issues about which she was concerned. *Id.* at 7–9. Mr.
Hines then e-mailed Plaintiff on December 23, 2019, expressing concern but largely
referring Plaintiff back to Ms. Benedicto and Ms. Nelson in HR. *See id.* On January 9,
2020, Ms. Nelson responded, asking Plaintiff to let her know if she wanted to schedule
time with her, Ms. Benedicto, and Mr. Hines to discuss the issues raised in her e-mail
correspondence. *Id.* at 7. Plaintiff responded on January 11, 2020, saying that she "would
love to schedule a phone call," and that "[o]ne of the most uncomfortable issue[s] lately
has been with Mark and every time I am either in the break room or leads office, ready to
cash out, he always makes a joke about how he's going to contact HR for sexual
harassment." *Id.* at 6. She indicated that she would be available after January 23, 2020,
*id.*, as she was leaving town on January 13, 2020, *id.* at 5. Ms. Nelson responded on
January 12, 2020, asking whether Plaintiff had reported Mr. Buenaflor's comments "to a
leader on shift" and if Plaintiff would be available before January 23, 2020. *Id.* at 6.
Plaintiff wrote back the same day, saying she had "yet to report it" "[d]ue to the lack of
confidence in the reporting system." *Id.* at 5–6. On January 14, 2020, Ms. Nelson

responded that "[Ms. Benedicto] will be working with SAN leadership to look into your concerns.  Time will be scheduled with you when you return to get more details."  *Id.* at 5. The record does not disclose whether any further action was taken.

On January 29, 2020, Plaintiff e-mailed her resignation to Ms. Ceron.  Pl. Depo. Tr.—Tran at 244:25–45:14; Aguirre Decl. Ex. 11.  In an e-mail with the subject line "Final," which cc-ed numerous other people, including Ms. Nelson, Ms. Benedicto, and Mr. Hines, Plaintiff lamented that the acts of sexism and harassment she had reported to HR "have gone unresolved," and that she "can name at least five people who've quit/been fired who've brought issues up with HR with no resolution."  Aguirre Decl. Ex. 11.  She indicated that she had "developed mental health issues from all the damage [she has] encountered while working [at Alaska]."  *Id.*

On December 23, 2021, the EEOC closed its file on Plaintiff's Charge.  *See* Zwerin Decl. Ex. N.  The reason provided was that "[t]he EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute.  This does not mean the claims have no merit.  This determination does not certify that the respondent is in compliance with the statutes."  *Id.* Plaintiff was issued her right-to-sue notice along with the dismissal.  *See id.*

### B.    *Harassment of Others and Reports Thereof*

Sometime in 2018, Maria Venegas, a CSA who transitioned from Virgin America to Alaska after the acquisition, declares that Mr. Buenaflor sexually harassed her, remarking about how big her breasts were after returning from maternity leave, but nothing came of her complaints about his conduct to both another lead named Diana or a manager named Claudia (presumably Claudia Almaraz-Richardson).  Errata Ex. A ("Venegas Decl.") ¶¶ 2, 5; Aguirre Decl. Ex. 12 at 19.  Ms. Venegas told another CSA named Leslie (presumably Leslie Dizon) about the incident, and Ms. Dizon disclosed that Mr. Buenaflor had sent her a message asking her to "send [him] nudes."  Venegas Decl. ¶ 6; Aguirre Decl. Ex. 12 at 19.  Ms. Venegas also talked with Yvette (presumably Yvette Arriaga Viveros) about how

/ / /

Mr. Buenaflor made female CSAs feel uncomfortable, and Ms. Arriaga Viveros disclosed that she had kissed Mr. Buenaflor.  Venegas Decl. ¶ 7; Aguirre Decl. Ex. 12 at 19.

Ms. Venegas recalls witnessing Mr. Buenaflor tell Plaintiff "that he wanted to eat the chocolate off of her face" one time when they were all in the leads' office and Plaintiff was eating chocolate.  Venegas Decl. ¶ 8.  She also witnessed Mr. Buenaflor and another employee, Alvin (presumably Alvin Atienza), make sexually inappropriate comments about women.  *Id.* ¶¶ 9–10; Aguirre Decl. Ex. 12 at 19.  Ms. Venegas declares that "[her] impression from watching Mark's interactions with Beatriz was that Beatriz'[s] reporting Mark's behavior made Mark frustrated and angry at Beatriz."  Venegas Decl. ¶ 11.  When Ms. Venegas quit her job in the summer of 2019, she "told them [she] felt really uncomfortable about Mark being [her] supervisor and that nothing was ever done about his sexual harassment."  *Id.* ¶ 12.

Donna McCoy, a CSA who transitioned to Alaska from Virgin America, verbally reported to her manager, Claudia (presumably Claudia Almaraz-Richardson), that Mr. Buenaflor was "touching the young girls inappropriately.  Like on their back, he's always got his hands on their waist when they're walking around."  Aguirre Decl. Ex. 7 (Deposition Transcript of Donna McCoy ("McCoy Depo. Tr.," ECF No. 38-4)) at 62:14–63:28.  She thought she made the report approximately six months before January 2019—i.e., in approximately July 2018.  *Id.*  The conversation was "short"—"[n]o more than 5 minutes."  *Id.* at 63:26–28.  Alaska Airlines Case AS-2019-316, Alaska's sexual assault/sexual harassment investigation of these allegations, indicates that the incident was reported on January 18, 2019, the case was opened February 4, 2019, and the case was closed 86 days later on May 2, 2019.  *See* Zwerin Decl. Ex. L at 107.  The case report states that Ms. McCoy e-mailed Ms. Ceron on January 18, 2019, and that Ms. Ceron forwarded the e-mail to HR on January 21, 2019.  *See id.*  The e-mail, reproduced in the report, states that, "[f]or many months [Ms. McCoy] ha[s] observed a male lead touching young female CSAs inappropriately at work," and provided the following "most recent example": when Ms. Arriaga Viveros had just flown in from a trip, she was talking with Mr. Buenaflor and

he had "his hands . . . on her legs, back, arm, etc[.] over a period of time," which "made [Ms. McCoy] very uncomfortable." *Id.* Although Ms. Arriaga Viveros was not "working" at that time, "this was a solid example of [Mr. Buenaflor's] behavior even while they are working. [Ms. McCoy] ha[s] watched it numerous times." *Id.* Ultimately, it was determined that the case was "Not Substantiated," but "Coaching" was nonetheless advised. *Id.* at 110. HR obtained written statements from and interviewed Ms. Arriaga Viveros and Heather Tomlinson, both of whom "stated that they do not feel threatened or pressured by Mark." *Id.* On March 6, 2019, Ms. Ceron "documented conversation with Mark Buenaflor . . . to discuss being mindful of perceptions and professionalism, in addition to resetting behavior expectations as a Lead." *Id.* at 111.

In connection with Plaintiff's EEOC Charge, the EEOC interviewed multiple witnesses who spoke about incidents of harassment they either had experienced or witnessed at Alaska during the time of Plaintiff's employment. For example, the EEOC interviewed an individual named Terry Benavidez on or about October 6, 2020. *See* Aguirre Decl. Ex. 13 at 25. At the time of his interview, Mr. Benavidez was a CSA with Alaska, and he had transitioned over from Virgin America. *Id.* He said that he "lost co-workers" because "[j]ust about everything was done to them," including "[l]ast minute gate assignments, scheduling issues, sexual harassment, all kinds of things. They complained to leadership and nothing got done. They went above everyone's head, and nothing was done. They don't want anyone complaining." *Id.* Mr. Benavidez said that he "ha[s] heard inappropriate comments by some of the men toward women. How they look, things like that. [He] ha[s] also witnessed inappropriate eye contact or body contact between the Lead CSA and female CSA. The females and males CSA would complain. Alaska did nothing." *Id.* at 26. "They tell you to report everything to the union and nothing gets done." *Id.* Mr. Benavidez said he was a victim of sexual harassment, as a Lead CSA propositioned him and "would inappropriately touch [his] ass as he walked by." *Id.* He said he never reported this behavior because he was embarrassed. *Id.* Mr. Benavidez voiced that "the Leads think they are empowered to do anything because . . . [t]he Leads under the union agreement

they are not leadership." *Id.*  He called Mr. Buenaflor "quite the character" who "thinks he has autonomy to proposition women at work.  Everyone knows about it, everyone knows HR was involved, and nothing was done about it." *Id.*  Mr. Benavidez said that "[he] ha[s] witnessed [Mr. Buenaflor] touching women." *Id.*  He reiterated that "[m]anagement knows there has been several allegations an[d] doesn't do anything." *Id.* at 27.  Mr. Benavidez also called Mr. Atienza "a piece of work" who "does whatever he wants to do" and is "extremely passive aggressive." *Id.*

The EEOC also spoke with Denisse Ortega on or about October 7, 2020.  *See* Aguirre Decl. Ex. 13 at 22.  At the time, she was a CSA with Alaska, and she was hired after the Virgin America merger.  *Id.*  She noted that "[w]e go to union reps when we have issues with supervisors," but "[t]he union does not help at all." *Id.* at 23.  Although Mr. Atienza never touched her inappropriately or said anything to her that was inappropriate, she said she knew that he gossiped about one of her co-workers, Danielle Kaminsky, who allegedly "lean[ed] on him with her boobs in front of other agents." *Id.*  Ms. Ortega noted that Mr. Buenaflor was "really flirty" and "kept saying" to Ms. Ortega that she was "so pretty" and "so beautiful." *Id.*  He would also say things like, "Oh look at her" in a "malicious way" when she'd walk by. *Id.*  "He would always hit on [her]." *Id.*  He would say things like this "every single day he saw [her]" and would say them in Tagalog "so nobody else would understand." *Id.*  She would call him "big brother" in Tagalog "just to make him feel awkward when he hit on [her]," and "he sexually harassed [her] for the first three months," at which point she "told him to stop and that [she] was going to tell his wife and [her] supervisor," at which point he stopped. *Id.*  Ms. Ortega indicated that "Mark Buenaflor preys on young women who are on probation . . . because he knows he can get away with it," as "[y]oung women who need their job are not going to say anything." *Id.* at 24.  She also said that "[p]eople just shrug their shoulders when it comes to Mark and Alvin," and that although "[l]ots of people report them," "[m]anagement never has done anything about either one of them." *Id.*  Ms. Ortega said she "just tr[ies] to avoid them." *Id.*

/ / /

On or about October 23, 2020, the EEOC interviewed Jennifer Inacio.  *See* Aguirre Decl. Ex. 13 at 28.  She was a former CSA who also transitioned from Virgin America.  *Id.*  She quit her job in March 2019.  *Id.*  Ms. Inacio indicated that "[s]upervisors were useless."  *Id.*  She said she would not have known what to do if she had had a problem while working for Alaska, because "[s]upervisors defended each other so [she] didn't tell them anything," and while "[t]he policy was to speak to a supervisor," "they were all bad leads, managers, supervisors."  *Id.* at 29.  Although Ms. Inacio said that "[n]othering ever happened to [her]," she "heard things were going on with co-workers," and that Mr. Buenaflor "would be very touchy feely with girls" and "did things in the airport like the jetway.  Very creepy."  *Id.*  She told her interviewer that Mr. Buenaflor "would come up from behind girls and rub their shoulders.  [She] saw him doing it to other girls.  Very creepy touchy feely.  [She] also saw him grabbing girls and giving them weird hugs."  *Id.*  Mr. Buenaflor was Ms. Inacio's Lead CSA and "definitely talked about women and body parts. . . .  He was [a] gross guy," and "a nasty guy."  *Id.*  When he saw women, he would say things like, "Oh wow, look at her."  *Id.*  She said she never filed any complaints against him because "[she] knew management all covered each other's butts" and "[i]t was worthless to complain.  [She] kn[e]w of some people who did complain but nothing was done."  *Id.*  Ms. Inacio said that "Alvin was also very creepy to [her]" and "threatened girls of telling husband or boyfriend they were hooking up with employees.  Big gossip.  [She] witnessed Alvin touching a girl any chance he got.  Rub shoulders, put his arm around the girls, weird jokes."  *Id.*  She also claimed to have seen the text messages he sent to Plaintiff threatening to tell her husband about her purportedly sleeping with someone else.  *Id.*

The EEOC also spoke with Ms. Venegas on or about February 2, 2021.  *See* Aguirre Decl. Ex. 13 at 30.  According to Ms. Venegas, the policy concerning sexual harassment was "to speak to your shift Lead and send an[] email out.  Which we all did . . . .  Tell your supervisor via email who would let HR know."  *Id.*  Ms. Venegas said she "heard some things that made [her] uncomfortable," including "[a] lot of racial comments," such as that someone "preferred Mexicans for sex."  *Id.*  Ms. Venegas experienced a problem with

invasion of her privacy when information about her health was being disclosed at work, and although "[she] talked to [her] union representative who verified invasion of privacy . . . they didn't do anything." *Id.* She said there was also a "miscommunication about [her] calling out sick," but while "[t]he union kept saying they were going to do something about it, . . . nothing was ever done." *Id.* When Ms. Venegas returned from maternity leave, Mr. Buenaflor "ma[d]e comments about [her] breasts being big," which "made [her] feel very uncomfortable." *Id.* at 30–31. While Ms. Venegas "told one of the leads about it, . . . nothing was ever done except not assigning him to flights to work with [her]." *Id.* at 31. Ms. Venegas said she "heard Mark and saw Mark doing this all the time. A girl was eating chocolate and he told her he wanted to eat the chocolate off her face. This happened in the Lead Office. [She] believe[d] it was Beatriz or Bea, she was the only one in the station." *Id.* Ms. Venegas "later had a conversation with Bea about it" and told her about what Mr. Buenaflor had said about her breasts. *Id.* She said he would make "sexual comments about women," like, "Oh she is very fine!", and she never worked with him after these incidents. *Id.* She did not recall Jeff Umali, but she said Alvin was "gross, like Mark. He talks about breasts, and butts, and sex positions. One time we were all by a gate and he mentioned about a girl's butt. So [Ms. Venegas] voiced opposition and walked away. He was always saying things gross like that." *Id.* Ms. Venegas said that Mr. Buenaflor "would show people weird things [on his phone] but never to [her]." *Id.* All the harassment she experienced was verbal. *Id.* She said "a lot of people would complain" by sending e-mails to "one of the supervisors." *Id.*

The EEOC also interviewed Veronica Evers on or about February 2, 2021. *See* Aguirre Decl. Ex. 13 at 32. She was a CSA hired directly by Alaska and not transitioned from Virgin America. *Id.* She said if she had a problem she "would go to human resources immediately after speaking to the [general manager] . . . . I really don't have the faith in supervision." *Id.* at 33. She said she was never sexually harassed, but "[she] did hear something at the ticket counter once. There was one guy his name was Jeff Umali, who said something to a male co-worker who had just broken up with his girlfriend. Jeff said,

'Women are so simple, you just fuck them and throw them away,' meaning women were disposable. I believe one of my co-workers who was there and heard it, Beatriz, stepped in and told Jeff, 'Don't say that!'" *Id.* Those were the worst comments Ms. Evers had heard about. *Id.* She recalled three women "who have been outspoken and shared with [her] that they were sexually harassed. Beatriz was one. Yvette Arriaga and Ariel . . . Markum," and there were "a ton of rumors about" Christy Velasquez. *Id.* Ms. Evers indicated that the three women who confided in her that they were sexually harassed were all harassed by Mr. Buenaflor. *Id.* He kissed Ms. Arriaga in the jetway and "triggered Beatriz to leave." *Id.* Ms. Evers "worked with Mark Buenaflor a lot. He is very flirty with the girls," although "[h]e knows [Ms. Evers] will not play along," so he did not ever target her. *Id.* She "only know[s] him as a CSA Lead" and "do[es]n't think [he] is in the union." *Id.*

### C.   *Alaska's Harassment Policies*

Alaska's "Our People Policies" (the "OPP") express an anti-harassment stance that "goes for everyone: Managers, supervisors, leaders, co-workers, and non-employees," and recognize that "an employee doesn't need to be the person targeted by the harasser to be affected by the offensive conduct." Aguirre Decl. Ex. 4 (ECF No. 38-3) at 7. Under the subheading "How to report harassment or discrimination," the OPP states:

> Whenever you see or hear something in the workplace that you find offensive, including conduct that rises to the level of harassment or discrimination covered by this policy, we encourage you to say something directly to the employee who offended you . . . . However, if any employee is not comfortable doing this, or the offensive conduct covered under this policy continues, then he or she must promptly report any offending behavior, whether such behavior is directed towards him or her personally or to other employees at Alaska Airlines. Employees may direct their complaints to a supervisor, manager, or leader. You can also contact your HR Business Partner or call our Ethics Hotline . . . .

/ / /

22

Zwerin Decl. Ex. B at 29–30.  The OPP notes that "[s]upervisors and managers who know or receive reports or complaints of offending behavior must promptly notify the applicable HR Business Partner so that appropriate action can be taken," and that "Alaska Airlines will promptly and thoroughly investigate all complaints about behavior covered under this policy."  *Id.* at 30.  The OPP further provides that "[e]mployees who believe they have been retaliated against for having used this complaint procedure or participated in an investigation must promptly notify his or her HR Business Partner or use any of the reporting options described above so that such concerns can be investigated."  *Id.*  More generally, the OPP "encourage[s] an 'open door' policy," which "means if you feel your manager or supervisor has been unfair with you, or has not enforced team rules in a reasonable and even-handed way, we want you to be able to talk with them about it."  Aguirre Decl. Ex. 4 at 7.  Alternatively, the OPP "encourage[s] you to talk to a manger up another level," and indicates that, "[i]f you feel you've been unfairly treated, you . . . can contact the People Team or another leader you trust.  Questions?  Talk to your leader or HR Business Partner."  *Id.*

Alaska also has a "Code of Conduct and Ethics" (the "Code").  *See generally* Zwerin Decl. Ex. A.  The Code also makes clear that "unlawful harassment and discrimination is prohibited" and states: "If you see or hear anything that might be unlawful harassment and discrimination, or even just inappropriate workplace behavior, you must report the behavior immediately to your leader or HR."  *Id.* at 13.  The Code further provides that "[a]nyone who reports a violation of our Code truthfully and in good faith (meaning you have honest intentions) is protected against retaliation from any leader, co-worker, or director.  If you believe you have been the target of retaliation, contact the Ethics and Compliance department, HR, or a leader you trust."  *Id.* at 7.

Mr. Buenaflor stated during his deposition that "[y]ou cannot report any harassment or things like that to a lead.  You're supposed to direct your concern to management," but he acknowledged that Alaska's policies do not state that you cannot report harassment to a Lead CSA.  Buenaflor Depo. Tr.—Aguirre at 263:23–64:22.

### D.     Lead CSAs' Job Duties and Responsibilities

According to the Alaska job description for "Lead Customer Service Agent," one of a Lead CSA's "key duties" is to "[s]upervise and . . . train up to twenty (20) CSAs in all other classifications." Aguirre Decl. Ex. 1 at 3. The same "key duties" are listed in the job description for "Lead Customer Service Agent" contained in the collective bargaining agreement ("CBA") between Alaska and the Union. *See* Zwerin Decl. Ex. M at Art. 4.D ("[T]he Lead Customer Service Agent will supervise and may train agents in all other classifications."). Alaska's Rule 30(b)(6) witness, Steven Zwerin, stated during his deposition that he had no recollection of ever reading a job description for the position of Lead CSA that did not indicate that one of the key duties of a Lead CSA included the supervision of CSAs. PMK Depo. Tr.—Aguirre at 71:21–72:5.

Ms. Ceron, the Director, Stations Operations, at the San Diego International Airport (the "San Diego Station") for Alaska, declares that she was the General Manager, Stations Operations, from 2018 until October 2021, but that her duties have remained essentially the same in her new position. Ceron Decl. ¶¶ 1–2. According to Ms. Ceron, "[t]here are three levels of management at the San Diego Station": the Director, Stations Operations; a Services Manager; and four Station Supervisors. *Id.* ¶ 4. "CSAs and CSAs Lead report to this management chain of command." *Id.* ¶ 5. CSAs and Lead CSAs perform the same job duties and are in the same Union bargaining unit. *Id.* ¶ 6. Lead CSAs "are also tasked with the responsibility of ensuring that Alaska's operations run smoothly on any given day." *Id.* They ensure that there are enough CSAs at each of the four typical work stations, and "[w]hile CSA Leads direct CSAs where to work out of these four locations during the day, they do not actually direct the daily work activities that CSAs perform at these locations." *Id.* "CSA Leads have no discretion to use independent judgment to supervise and evaluate CSA's [sic] work." *Id.* Lead CSAs perform the "clerical tasks" of ensuring CSAs take meal and rest breaks, approving shift trades, and approving overtime. *Id.* ¶ 7. Lead CSAs have no authority to make or recommend changes to CSAs' schedules. *Id.* ¶ 8. Lead CSAs also lack the power to discipline CSAs. *Id.* ¶ 9. Lead CSAs provide job

performance feedback to both CSAs and management, but "their feedback does not play any role in the decision to issue discipline to a CSA." *Id.* They cannot hire, fire, transfer, promote, assign, or reward CSAs, or recommend such decisions. *Id.* ¶ 10. CSAs are selected to be Lead CSAs in a nondiscretionary manner based on (1) whether the CSA has submitted a "bid" to become a lead, and (2) seniority. *Id.* ¶ 11. Lead CSAs do receive higher compensation than CSAs. *Id.* Ms. Ceron declares that Alaska conducts in-depth interviews of candidates and makes hiring decisions based on individual qualifications "when filling a supervisory role." *Id.* ¶ 12.

When asked about his job duties as a Lead CSA, Mr. Buenaflor stated during his deposition that "[a] lead CSA's job duty is to make sure every day or daily the operations run smoothly, make sure—making sure all the CSAs are being successful and we're assisting them with what they need and also making sure, obviously, guest satisfaction in case of irregular ops or—that's it." Tran MSJ Decl. Ex. B (Deposition Transcript of Mark Buenaflor ("Buenaflor Depo. Tr.—Tran," ECF No. 34-2)) at 126:9–14. To ensure smooth operations, Lead CSAs "mak[e] sure all floors are covered and all [incoming] flights are being met" with a jetway so passengers can deplane. *Id.* at 127:1–16. Mr. Buenaflor also stated that Lead CSAs can adjust the daily schedule as needed to ensure coverage without the need for permission, and that they do so daily, "[e]very five minutes." Buenaflor Depo. Tr.—Aguirre at 53:6–54:6. Lead CSAs approve or reject CSA shift trades that happen less than twenty-four hours before the shift's start time, and Mr. Buenaflor approves such trades on average two to three times each shift. *Id.* at 70:6–72:18. Lead CSAs also assign overtime to CSAs who want overtime an average of two to three times per shift. *Id.* at 73:15–74:7. Lead CSAs also "upgrade" qualified CSAs as necessary to fill a needed role for a day, such as the role of Lead CSA or Departure Coordinator. *Id.* at 89:4–90:7. Only about ten of approximately 120 CSAs were qualified for a Lead CSA upgrade during the 2018 to 2019 timeframe, and a CSA who was upgraded for a shift would receive higher pay for that shift. *Id.* at 91:24–92:15. Lead CSAs can and do recommend that managers talk to or coach CSAs for a variety of behaviors, including not meeting their flights, taking

overlong breaks or lunch periods, or not being on their assigned duty. *Id.* at 101:21–02:10. Mr. Buenaflor estimates between four and twenty CSAs have been coached or disciplined as a result of his recommendations. *Id.* at 105:5–13. Lead CSAs give CSAs orders, instructions, and assignments. *Id.* at 124:25–25:3. Lead CSAs also ensure that CSAs take their lunch and rest breaks, and Mr. Buenaflor has to remind CSAs approximately twice a day to take their breaks. *Id.* at 129:11–30:13. When a CSA leaves the company, "management sends out an email to the leadership, which is leads and schedulers, to move on with the schedule making sure that a CSA is not with the company anymore, is not on the schedule so we can cover overtime or the duties." *Id.* at 143:5–9. Lead CSAs also routinely report CSAs' absences. *Id.* at 192:2–8. During her deposition, Ms. McCoy stated that Lead CSAs have the individual discretion to grant "voluntary time off" or "VTO" to a CSA who calls in ahead of a shift and says they are running 15 to 30 minutes late. McCoy Depo. Tr. at 19:6–20:8. She said that sometimes Lead CSAs say "yes" and sometimes "no," but "it just seemed like some people, they always said yes to," and that the decision could result in the awarding of "points" that could lead to discipline. *Id.*

Alaska's Rule 30(b)(6) witness stated that, although the job description for "Lead CSA" includes the word "supervise," "Alaska Airlines' practice is that leads have no authority to hire, fire, or discipline employees." Tran MSJ Decl. Ex. C (Deposition Transcript of Steven Zwerin ("PMK Depo. Tr.—Tran," ECF No. 34-2)) at 54:4–7. During her deposition, Plaintiff acknowledged that Lead CSAs do not have the sole authority to permanently promote other employees. Pl. Depo. Tr.—Aguirre at 155:6–10. While Lead CSAs cannot independently fire CSAs, Plaintiff indicated that their feedback and comments to supervisors can result in a CSA's firing. *Id.* at 155:20–56:17. Plaintiff conceded that Lead CSAs lack the authority to independently hire CSAs. *Id.* at 156:18–23. Ms. Benavidez, during her EEOC interview, voiced that Lead CSAs are "not leadership" under the Union agreement and that the position is awarded solely due to seniority rather than merit. Aguirre Decl. Ex. 13 at 26–27. Ms. Evers said that CSA Leads were "non-management" because they "are in the union," but that "[she] think[s] the Leads

get questioned about someone's performance, but [she] do[es]n't know [how] much weight the Lead's comments are . . . .  [She] found out supervisors question the CSA Leads for [determining who passes] probation." *Id.* at 32.  Mr. Buenaflor stated during his deposition that "each union employee cannot discipline another union employee," and that "it's not my job title.  I'm not trained to do that."  Buenaflor Depo. Tr.—Aguirre at 263:2–17.

Ms. Inacio, during her EEOC interview, noted that CSAs "mainly dealt with leads." Aguirre Decl. Ex. 13 at 28.  Mr. Buenaflor said during his deposition that CSAs on average communicate with a "supervisor" "[r]arely," just "[t]wo to three times a year."  Buenaflor Depo Tr.—Tran at 123:9–19.  Ms. Venegas' declaration states that Mr. Buenaflor was her "direct supervisor."  Venegas Decl. ¶ 5.  She says that "it was pretty clear that the Lead CSA employees were the supervisors on duty.  As a CSA, you would go to the Leads for any issues.  Leads would assign us duties like scheduling the ticket counter and things like that.  The Leads would also have conversation[s] about discipline with you." *Id.* ¶ 3.  She also said she thought CSAs were supposed to report any misconduct to Lead CSAs, "because they were the direct supervisors and they were the only supervisors we had day-to-day access to.  Out of any supervisory employees, by far we had the most face-to-face interaction with the Leads." *Id.* ¶ 4.  Ms. Inacio's declaration likewise expresses her view as a CSA that Lead CSAs were "supervisors."  Errata Ex. B ("Inacio Decl.") ¶¶ 4, 6 & 14.

## II.    Procedural Background

Plaintiff filed this action in the Superior Court of the State of California, County of San Diego, on January 4, 2022, alleging causes of actions for: (1) Quid Pro Quo Sexual Harassment – California Government Code § 12940(j); (2) Hostile Work Environment – Sexual Harassment – California Government Code § 12940(j); (3) Disparate Treatment – California Government Code § 12940(a); (4) Failure to Prevent Harassment, Retaliation, and Discrimination – California Government Code § 12940(k); (5) Negligent Retention; (6) Negligent Infliction of Emotional Distress; and (7) Constructive Wrongful Termination in Violation of Public Policy.  *See* ECF No. 1-2 ("Compl.").  Defendant removed to this District on the basis of diversity jurisdiction.  *See* ECF No. 1 ("Notice") at 3 (citing 28

U.S.C. § 1332(a)(1)).  On March 16, 2022, Plaintiff moved to remand.  *See generally* ECF No. 9.  This Court denied the motion.  *See generally* ECF No. 17.

On February 13, 2023, Defendant filed the instant Motion for Summary Judgment.  *See* MSJ.  On March 16, 2023, Plaintiff opposed.  *See* MSJ Opp'n.  Five days later, on March 21, 2023, Plaintiff filed a Notice of Errata lodging two declarations cited by but inadvertently omitted from the Opposition.  *See generally* Errata.  Defendant thereafter filed its Reply, *see* MSJ Reply, as well as the Motion to Strike mentioned *supra* at note 1.  Plaintiff subsequently filed a Motion for Sanctions[7] premised on the filing of Defendant's Motion to Strike.  *See* ECF No. 51.

### EVIDENTIARY OBJECTIONS

Each Party objects to some of the evidence filed by the other.  *See generally* Pl.'s Evid. Objs.; Def.'s Evid. Objs.  "'[A] party does not necessarily have to produce evidence in a form that would be admissible at trial' to survive summary judgment."  *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1253 (S.D. Cal. 2018) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001)).  "Rather, 'Rule 56[(c)] requires only that evidence "would be admissible", not that it presently be admissible.'"  *Id.* (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006)).  Accordingly, at the summary judgment stage, "[t]he focus is on the admissibility of the evidence's contents, not its form."  *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)).

Having reviewed the Parties' Evidentiary Objections and Defendant's Reply to Plaintiff's Evidentiary Objections, the Court finds, particularly in light of the absence of any arguments from the Parties to the contrary, that the vast majority concern evidence that could be presented in an admissible form at trial.  *See, e.g.*, *Burch*, 433 F. Supp. 2d at 1119

---

[7] The Court will rule on the Motion for Sanctions separately in due course.

("[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and, therefore, are "superfluous" in the summary judgment context, as a "court can award summary judgment only when there is no genuine dispute of material fact."); *Fonseca*, 374 F.3d at 846 ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial.'") (quoting *Fraser*, 342 F.3d at 1037); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1551 (9th Cir. 1990) (holding trial court's consideration of unauthenticated document on summary judgment was harmless error where a "competent witness with personal knowledge could authenticate the document"); *Holt v. Noble House Hotels & Resort, Ltd.*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) ("Accordingly[, on a motion for summary judgment], the Court does not consider any objections on the grounds that the evidence is irrelevant, speculative, argumentative, prejudicial, that it constitutes hearsay or inadmissible lay opinion, or that there is a lack personal knowledge." (citing *Burch*, 433 F. Supp. 2d at 1122)); *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117 (E.D. Cal. 2016) (summarily overruling objections at summary judgment on the basis of relevance, hearsay, lack of foundation, lack of personal knowledge, prejudice, improper character evidence, and assuming facts not in evidence); *Hunt v. City of Los Angeles*, No. CV 17-8064 JFW (PVC), 2021 WL 768248, at *11 (C.D. Cal. Jan. 26, 2021) (noting that objections that evidence violates the "best evidence" rule go to the form of the evidence rather than its ultimate admissibility), *report and recommendation adopted*, 2021 WL 765418 (C.D. Cal. Feb. 26, 2021), *aff'd*, No. 21-55310, 2022 WL 3714490 (9th Cir. Aug. 29, 2022); *see also Gault v. United States*, No. CV 20-10687 PA (PVC), 2022 WL 14177074, at *12 (C.D. Cal. Sept. 26, 2022), *report and recommendation adopted*, 2022 WL 14317642 (C.D. Cal. Oct. 22, 2022) (finding "[s]ome of Defendant's objections are seemingly well-taken," but, "[n]onetheless, Defendant's objections often do not explain why the proffered evidence cannot be presented in an admissible form at trial," and accordingly denying them as moot). The

Court therefore **OVERRULES WITHOUT PREJUDICE** all Evidentiary Objections not separately addressed below.  The Parties may reassert said Evidentiary Objections at a later stage in the proceedings.  *See Madrigal v. Allstate Indem. Co.*, No. CV 14-4242 SS, 2015 WL 12747906, at *8 (C.D. Cal. Sept. 30, 2015).

The sole exception to the above is that the Court **OVERRULES** on the merits Defendant's Evidentiary Objections to the chart in Plaintiff's Opposition summarizing the various supervisory powers of Lead CSAs.  *See* Def.'s Evid. Objs. at 3–6; MSJ Opp'n at 4.  "These are not objections to the evidence, but objections to the other party's description of the evidence, and the Court does not consider them."  *Paine v. Inv. & Admin. Comm. of Walt Disney Co. Sponsored Qualified Benefit Plans*, No. 220CV08610VAPKSX, 2022 WL 4492812, at *3 (C.D. Cal. Sept. 27, 2022) (citing *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1034 (C.D. Cal. 2013)).

## MOTION FOR SUMMARY JUDGMENT

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute

regarding a material fact.  *Id.*  Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial.  *Id.* at 324.  This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## II.    Analysis

Defendant seeks dismissal of each of Plaintiff's seven claims, as well as Plaintiff's request for punitive damages.  *See generally* Memorandum in Support of Motion for Summary Judgment ("Mot. Mem.," ECF No. 34-1 at 11).  The Court addresses each of these issues in turn, in the order presented in Defendant's Motion.

### A.    *Claim 2: Hostile Work Environment Harassment*

In California, "[t]he elements [for a claim of hostile work environment sexual harassment] are: (1) plaintiff belongs to a protected group; (2) plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) respondeat superior." *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 608 (1989) (footnote omitted). "Such a hostile environment may be created even if the plaintiff never is subjected to sexual advances."  *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 461–62 (2005) (citing *Mogilefsky v. Superior Court*, 20 Cal. App. 4th 1409, 1414–15 (1993)).

The last of the elements, respondeat superior, relates to the standard of liability to be applied to the employer and depends on the harasser's level of supervisory authority. Under FEHA, an employer is liable for sexual harassment of an employee "by an

employee, other than an agent or supervisor," only "if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."   Cal. Gov't Code § 12940(j)(1).   "This is a negligence standard."   *State Dep't of Health Servs. v. Superior Court*, 31 Cal. 4th 1026, 1041 (2003). However, under FEHA, "an employer is strictly liable for *all* acts of sexual harassment by a supervisor."   *Id.* (emphasis in original).

Defendant argues that Plaintiff's claim for hostile work environment harassment fails as a matter of law.   Mot. Mem. at 10.   First, Defendant asserts that Mr. Buenaflor was not a supervisor, so a negligence standard of liability applies.   *Id.* at 10–13.   Second, to the extent a negligence standard applies, Defendant argues that it took prompt and effective action once it learned of the conduct in June 2019.   *Id.* at 14–15.   Third, Defendant claims the conduct was neither severe nor pervasive.   *Id.* at 15–17.   The Court addresses each of these arguments in turn.

### 1.   *The Applicable Standard of Liability*

As an initial matter, the Parties dispute the standard under which Defendant's liability for this claim is to be adjudged.   Defendant contends that Mr. Buenaflor was not a supervisor, and hence a negligence standard applies, because "the undisputed facts establish that Buenaflor had no supervisory authority over Plaintiff."   Mot. Mem. at 10–13.   Plaintiff, however, contends that Mr. Buenaflor was a supervisor because Lead CSAs had the authority to, among other things, change work schedules, approve shift trades/overtime requests, report performance issues to management for discipline or termination, issue workplace orders, and supervise and train CSAs; thus, strict liability applies.   MSJ Opp'n at 12.   Further, Alaska held Lead CSAs out as supervisors in its job description posting, its employee manual, and its Union agreement.   *See id.* at 10. Defendant attacks the evidence on which Plaintiff relies to establish the supervisory authority of Lead CSAs, *see* MSJ Reply at 1; the Court, however, has rejected these arguments, *see supra* pp. 28–30; ECF No. 60.   Defendant argues that its labeling of Lead CSAs as "supervisors" in various policies and other official documents is inadequate to

make them so, as courts applying FEHA look to the functional responsibilities of the employee rather than mere titles or labels.  *See* MSJ Reply at 1–2 (citations omitted). Defendant further contends that the fact that Plaintiff and other CSAs believed Lead CSAs were their supervisors does not change this analysis, as "no person could reasonably believe that Lead CSAs are FEHA supervisors."  *Id.* at 4.

FEHA defines "supervisor" as follows:

> [A]ny individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

Cal. Gov't Code § 12926(t).  FEHA is to be construed broadly, to protect employees' right to hold employment without discrimination.  *Chapman v. Enos*, 116 Cal. App. 4th 920, 931 (2004) (citing *Kelly v. Methodist Hosp. of S. Cal.*, 22 Cal. 4th 1108, 1114 (2000)).  Courts applying California law have recognized that the EEOC's enforcement guidance construing who qualifies as a "supervisor" under Title VII is useful, albeit not controlling, in analyzing whether a given individual is a "supervisor."  *See, e.g.*, *id.* at 930 n.10.  The EEOC's "Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors" ("Enforcement Guidance") provides that an employer can be liable for the harassment of a supervisor who lacks actual authority "if the employee reasonably believed that the harasser had such power[,] . . . because, for example, the chains of command are unclear."  Enforcement Guidance ¶ III.B, *available at* a https://www.eeoc.gov/laws/ guidance/enforcement-guidance-vicarious-liability-unlawful-harassment-supervisors (issued June 18, 1999) (footnote omitted).

Although Defendant contests Mr. Buenaflor's status and authority as a supervisor, construing all facts and reasonable inferences in Plaintiff's favor, a reasonable jury could find that Mr. Buenaflor was Plaintiff's supervisor for purposes of her environmental sexual harassment claim.  During his deposition, Mr. Buenaflor stated that Lead CSAs can adjust

the daily schedule as needed to ensure coverage without the need for permission, and that they do so daily, "[e]very five minutes." Buenaflor Depo. Tr.—Aguirre at 53:6–54:6. Two to three times each shift, Mr. Buenaflor, as a Lead CSA, approved or rejected trades of CSAs' shifts requested less than 24 hours in advance. *Id.* at 70:6–72:18. Mr. Buenaflor also stated that Lead CSAs can and do recommend that managers talk to or coach CSAs for a variety of behaviors, and estimated between four and twenty CSAs were coached or disciplined as a result of his recommendations. *Id.* at 101:21–02:10, 105:5–13. He further claimed that Lead CSAs give CSAs orders, instructions, and assignments. *Id.* at 124:25–25:3. Plaintiff also offers the deposition testimony of Ms. McCoy, who stated that Lead CSAs had the individual discretion to approve VTO to CSAs who called before their shift to report they were running 15 to 30 minutes late, and that such requests were sometimes granted and sometimes not. McCoy Depo. Tr. at 19:6–20:8. Additionally, Plaintiff presents evidence that she and other CSAs considered Lead CSAs to be their supervisors. *See, e.g.*, Aguirre Decl. Ex. 9 (Plaintiff's June 18, 2019 e-mail to Ms. Benedicto concerning Mr. Buenaflor's harassment, calling him her "supervisor"); Venegas Decl. ¶ 5 (claiming, as a CSA, that Mr. Buenaflor was her "direct supervisor"); *id.* ¶ 3 ("[I]t was pretty clear that the Lead CSA employees were the supervisors on duty. As a CSA, you would go to the Leads for any issues. Leads would assign us duties like scheduling the ticket counter and things like that. The Leads would also have conversation[s] about discipline with you."); Inacio Decl. ¶¶ 4, 6 & 14 (referring to Lead CSAs as "supervisors").

Given the above evidence and the fact that Alaska's job descriptions for Lead CSAs in multiple documents portray Lead CSAs as "supervising" CSAs, a jury could find that Plaintiff and other CSAs reasonably believed Lead CSAs to be their supervisors. Accordingly, a genuine dispute of material fact exists as to whether Mr. Buenaflor was a supervisor, and the Court **DENIES** summary judgment in Defendant's favor on this point. *See, e.g.*, *Enos*, 116 Cal. App. 4th at 930 (finding evidence that deputy district attorney ("deputy DA") was investigator's supervisor within meaning of FEHA where deputy DA provided information to chief investigator to evaluate investigator, investigator cleared

time off with the deputy DA, and the investigator believed the deputy DA to be her supervisor or "boss"); *Coughlin v. Cal. Dep't of Corr. & Rehab.*, No. 2:08-CV-02772-GEB-JF, 2010 WL 1689463, at *8, 11–12 (E.D. Cal. Apr. 26, 2010) (finding genuine issue of material fact as to whether the plaintiff, a Cook II, reasonably believed coworker subsequently promoted to Supervisory Cook was her "acting supervisor" such that employer could be strictly liable under FEHA); *Almanza v. Wal-Mart Stores, Inc.*, No. 06-0553-WBS-GGH, 2007 WL 2274927, at *3, *3 n.5 (E.D. Cal. Aug. 7, 2007) (finding genuine dispute of material fact as to whether Lead Unloader was a supervisor for purposes of Unloader's sexual harassment claim, where, *inter alia*, "[the Lead Unloader] was the only apparent superior present in the unloading area on a regular basis"); *Marshall v. Boeing Co.*, No. CV168630DMGMRWX, 2019 WL 4391112, at *3–4 (C.D. Cal. June 10, 2019) (finding substantial evidence that Integration Lead was "supervisor" to plaintiff Technician where Technicians had limited interaction with "manager" compared with Integration Leads and Integration Leads supervised Technicians and their work area), *aff'd*, 812 F. App'x 558 (9th Cir. 2020); *Beagle v. Rite Aid Corp.*, No. C 08-1517 PJH, 2009 WL 3112098, at *13–16 (N.D. Cal. Sept. 23, 2009) (finding genuine dispute of material fact as to whether Rite Aid Shift Supervisor was "supervisor" for purposes of FEHA over Clerk where Rite Aid argued Shift Supervisor did not direct Clerk's work on a daily basis but only when Store Manager or Assistant Manager were not on premises, had no input into performance evaluations, and could not approve or set vacation days/schedules). Further, that Mr. Buenaflor was a member of the Union and therefore not "management" "is unpersuasive because the definition of 'supervisor' under the FEHA is not based upon the distinction between management and labor." *McKinzy v. Nat'l R.R. Passenger Corp.*, 836 F. Supp. 2d 1014, 1025 (N.D. Cal. 2011); *cf.* Mot. Mem. at 11–12.

      2.    *Known or Should Have Known; Immediate and Appropriate Action*

To the extent strict liability applies, whether Defendant knew or should have known of the conduct, or took immediate and appropriate corrective action, is a nonissue. *See Kelly-Zurian v. Wohl Shoe Co.*, 22 Cal. App. 4th 397, 415, *as modified* (1994)

("[H]arassment by a supervisor is unlawful regardless of whether the employer knows or should have known and fails to intervene.") (footnotes omitted).  However, to the extent Defendant is to be held to a negligence standard, these are necessary elements of Plaintiff's claim.

Under FEHA,

> "[o]nce an employer is informed of the sexual harassment, the employer must take adequate remedial measures.  The measures need to include immediate corrective action that is reasonably calculated to (1) end the current harassment and (2) to deter future harassment . . . .  The employer's obligation to take prompt corrective action requires (1) that temporary steps be taken to deal with the situation while the employer determines whether the complaint is justified and (2) that permanent remedial steps be implemented by the employer to prevent future harassment."

*M.F. v. Pac. Pearl Hotel Mgmt. LLC*, 16 Cal. App. 5th 693, 701 (2017) (quoting *Bradley v. Dep't of Corr. & Rehab.*, 158 Cal. App. 4th 1612, 1630 (2008)).  "If an employer knows a particular person's abusive conduct places employees at unreasonable risk of sexual harassment, the employer cannot escape responsibility to protect a likely future employee victim merely because the person has not previously abused that particular employee." *Id.* (citation and footnote omitted).  Further, "initiating an investigation . . . cannot be the only step taken.  An employer is required to take remedial action designed to stop the harassment, even where a complaint is uncorroborated or where the coworker denies the harassment." *Bradley*, 158 Cal. App. 4th at 1631 (citing *Hathaway v. Runyon*, 132 F.3d 1214, 1224 (8th Cir. 1997); *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995)).

Defendant argues that Plaintiff failed to report Mr. Buenaflor's conduct until June 2019, six months after the sexually harassing conduct had ceased, but that once Plaintiff lodged her complaint, "Alaska began a prompt and thorough investigation of Plaintiff's allegations." Mot. Mem. at 14.  Alaska contends that, although the investigation uncovered insufficient evidence to corroborate Plaintiff's claims, HR nonetheless counseled Mr. Buenaflor regarding its harassment policy. *Id.*  Alaska also attempted to schedule Plaintiff

and Mr. Buenaflor so as to separate them.  *Id.*  Finally, Alaska argues that it cannot be held liable where, as here, no further sexual harassment occurred after Plaintiff's complaint.  *Id.* at 15 (citation omitted).

Plaintiff counters that Alaska's corrective action was not "immediate" because Alaska was aware of Mr. Buenaflor's harassing behavior in June 2018 and, thus, a duty to investigate arose at that time; nonetheless, Alaska failed to investigate for a full year.  MSJ Opp'n at 5–6 (citing Venegas Decl. ¶¶ 2–5; McCoy Depo. Tr. at 62:14–63:24; Buenaflor Depo. Tr.—Aguirre at 152:9–21); *id.* at 16–17 (citation omitted).  Nor was Alaska's corrective action "appropriate," as Alaska's investigation and counseling of Mr. Buenaflor were minimal "and as of 2022, Buenaflor still believed it permissible to massage coworkers and to call them pet names at work."  MSJ Opp'n at 17–18 (citing Aguirre Decl. ¶ 4; *id.* Ex. 2; Buenaflor Depo. Tr.—Aguirre at 184:11–85:13).  Further, Plaintiff had to "pursue upper management, who did nothing when initially asked," to separate her and Mr. Buenaflor in the workplace, and even then, Mr. Buenaflor continued to antagonize and mock Plaintiff.  *Id.* at 18–19 (citations omitted).

In reply, Alaska contends that the undisputed evidence shows that its investigation of Plaintiff's claims was thorough, and courts should not second-guess an employer's personnel decisions to the extent the employer "acted fairly, in good faith, and based its decision on 'reasonable grounds' uncovered during its investigation."  MSJ Reply at 6–7 (citations omitted).  Further, Alaska claims the evidence Plaintiff cites does not establish that Alaska knew of Mr. Buenaflor's alleged behavior in June 2018; the earliest Alaska could have known was January 2019, when Ms. McCoy lodged a complaint, which was after the complained-of actions had already ceased.  *Id.* at 7.

The Court first addresses Defendant's argument that Plaintiff's failure to report Mr. Buenaflor's harassment until six months after the complained-of conduct had ceased means that Alaska did not know and had no reason to know of the harassment, and that other employees' complaints of sexual harassment "ha[ve] no bearing on Plaintiff's individual harassment claim."  Mot. Mem. at 14–15; *id.* at 14 n.15; MSJ Reply at 8 n.9.  The Court is

not prepared to preclude Plaintiff's claims as a matter of law on this basis. There is authority for the proposition that prior reports of an employee's or third party's misconduct could be sufficient to put the employer on notice of problematic behavior such that the employer has a duty to prevent future harassment to its employees. *See, e.g.*, *M.F.*, 16 Cal. App. 5th at 701 (finding employer knew or should have known that (i) trespasser was on premises for approximately an hour before employee was raped by the trespasser and (ii) he had propositioned other employees during that time; whether employer provided reasonable response was question of fact requiring weighing of evidence); *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 423 (11th Cir. 1999) ("A jury could reasonably infer from each of these allegations that [the employer] knew before [the plaintiff] filed her complaint in August 1994 that Fire Department supervisors were sexually harassing employees, yet failed to take any corrective action. We thus conclude that these allegations are sufficient to raise an issue of material fact as to whether [the employer] is both directly and vicariously liable for [the plaintiff's] abuse, and that the district court inappropriately granted summary judgment in favor of [the employer].").

Moreover, while Defendant argues that the absence of any further acts of harassment after Plaintiff formally filed her report is fatal to her claim, *see* Mot. Mem. at 15, the fact that a claim for harassment can be premised on a single incident, if severe enough, belies the argument that subsequent acts after the report are required as a matter of law, *see, e.g.*, *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021) ("A single incident of harassment 'can support a claim of hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis.'" (citation omitted)).

On summary judgment, the Court is not to weigh the evidence or make credibility determinations; rather, the Court must accept any reasonable inference that favors Plaintiff as the nonmovant. To support its position, Defendant offers as evidence the fact that it opened a case against Mr. Buenaflor for alleged sexual harassment on February 4, 2019, as a result of a January 18, 2019 e-mail sent by Ms. McCoy to Ms. Ceron that alleged that Mr. Buenaflor was "touching young female CSAs inappropriately at work," and that she

has "watched [such behavior] numerous times."  Zwerin Decl. Ex. L at 107.  However, Plaintiff offers deposition testimony from Ms. McCoy that she verbally reported concerns about Mr. Buenaflor's inappropriate touching of female employees to a manager named Claudia an estimated six months before that.  *See* McCoy Depo. Tr. at 62:8–63:28.  Alaska's OPP directs employees who "see or hear something in the workplace that [they] find offensive" to "promptly report" that behavior "to a supervisor, manager, or leader."  Zwerin Decl. Ex. B at 29–30.  Alaska's OPP further provides that "[s]upervisors and managers who know or receive reports or complaints of offending behavior must promptly notify the applicable HR Business Partner so that appropriate action can be taken."  *Id.* at 30.  A reasonable jury could therefore conclude that Defendant should have known of Mr. Buenaflor's potentially harassing conduct at that time.  However, Defendant offers no evidence in response that it took ***any*** action with regard to Ms. McCoy's concerns until February 2019, roughly seven months after the first report.  *See generally* Zwerin Decl. Ex. L.  After that investigation found the allegations unsubstantiated, Mr. Buenaflor was "coached" concerning his behavior in early March 2019.  *See id*.

As to Plaintiff's harassment reports specifically, Plaintiff first reported Mr. Buenaflor's harassment to Alaska HR by e-mail on June 9, 2019.  Pl. Depo. Tr.—Tran at 198:20–99:5; Aguirre Decl. Ex. 6 at 3.  Defendant opened a formal investigation on July 8, 2019, that notes Plaintiff's allegations against Mr. Buenaflor were received on June 18, 2019.  *See* Aguirre Decl. Ex. 12 at 16, 18.  Although HR began obtaining statements from and interviewing witnesses in July 2019, a reasonable jury could conclude, based on the evidence in the record, that HR did not question Mr. Buenaflor about the allegations until November 22, 2019, which was after HR had a "close out conversation" with Plaintiff.  *See id.* at 19.  Further, while Ms. Ceron made an effort to place Plaintiff and Mr. Buenaflor in different locations when they worked the same shifts once Plaintiff informed Ms. Ceron personally of Mr. Buenaflor's harassment in August 2019, approximately two months after Alaska became aware of Mr. Buenaflor's alleged harassment of Plaintiff, no other action / / /

appears to have been taken by Alaska to protect Plaintiff pending the outcome of the investigation.  Pl. Depo. Tr.—Tran at 254:10–55:7.

Viewing the evidence and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has presented sufficient evidence that a reasonable jury could conclude that Defendant knew or should have known that Mr. Buenaflor posed a risk of sexual harassment to its female employees as early as June or July 2018, *see* McCoy Depo. Tr. at 62:8–63:28, but that Defendant failed to take any action whatsoever until February 2019, when it began investigating Ms. McCoy's report and ultimately counseled Mr. Buenaflor on his behavior, *see generally* Zwerin Decl. Ex. L.  A reasonable jury could conclude that this response did not amount to immediate and adequate remedial measures that could have prevented the harassment as to Plaintiff, which in the summer 2018 timeframe consisted solely of unwanted pet names and had yet to escalate to unwanted physical touches.

Furthermore, a reasonable jury also could conclude that Defendant failed to take immediate and appropriate action once it became aware of Plaintiff's allegations specifically.  Defendant waited a month after Plaintiff first notified HR of Mr. Buenaflor's behavior to open an investigation into her allegations, and Defendant did not take any steps until approximately two months later, when Plaintiff spoke directly to her manager, to separate Plaintiff and Mr. Buenaflor pending the investigation into her allegations.  A reasonable jury could find that these actions were ineffectual and untimely.  Accordingly, the Court **DENIES** summary judgment in Defendant's favor on this ground as well.

### 3.    Severity and/or Pervasiveness of Conduct

Under either standard of liability, "[f]or [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Fisher*, 214 Cal. App. 3d at 609 (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)) (internal quotation marks omitted).  Thus, "'courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine,

or a generalized nature.'" *McKinzy*, 836 F. Supp. 2d at 1023 (quoting *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 283 (2006)).   When assessing whether conduct constitutes actionable harassment, "[t]he working environment must be evaluated in light of the totality of the circumstances," including, *inter alia*, the frequency of the discriminatory conduct; the total number of days over which the conduct occurred; the severity of the conduct; whether the conduct is "physically threatening or humiliating, or a mere offensive utterance"; whether the conduct "unreasonably interferes with an employee's work performance"; and the context of the conduct.  *Miller*, 36 Cal. 4th at 462 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *McKinzy*, 836 F. Supp. 2d at 1023 (quoting *Fisher*, 214 Cal. App. 3d at 610).   "To be actionable, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Lyle*, 38 Cal. 4th at 284 (citations and internal quotation marks omitted).

Defendant argues that the conduct here was not sufficiently severe or pervasive, given that "Plaintiff did not suffer a tangible job detriment" and the alleged conduct was "minimal [in] nature."  Mot. Mem. at 15–16.  Defendant contends that "courts have found that more egregious conduct did not create a triable issue."  *Id.* at 16 (citations and footnote omitted).  In response, Plaintiff argues that, considering the totality of the circumstances, including the fact that Plaintiff was a part-time employee, Mr. Buenaflor's conduct toward Plaintiff, as well as the other "unwanted sexual displays" that "saturated" the workplace, were both severe and pervasive.  MSJ Opp'n at 20–21.  Plaintiff argues that no "tangible employment action" is required in FEHA cases, but that sexual harassment that "was collectively severe or pervasive enough to change the conditions of Plaintiff's employment," coupled with the negative reports Lead CSAs made concerning Plaintiff in retaliation for her reports of harassment, collectively constitute a tangible job detriment. *Id.* at 21 (citations omitted).  Further, according to Plaintiff, her constructive discharge after enduring two years of a hostile work environment also constitutes a tangible employment action.  *Id.* at 21 (citations omitted).

Construing all evidence and reasonable inferences in Plaintiff's favor, during the roughly eight-month period of April through December 2018, Plaintiff, a part-time employee, was called gendered and unwanted pet names like "babe" and "sweetie" nearly every day she worked and approximately 40 to 50 times each overall; was subjected to unwanted shoulder massages approximately ten times while she was alone with her harasser in an office, with him once invoking her husband and on half the occasions commenting on how "tight" or "tense" her shoulders were; was subjected to unwanted caressing of her thigh on approximately five occasions when she was alone with her harasser in an office at the end of her shift; and was shocked when her harasser ate food from her hand when it was near enough to her mouth that she thought he was going to kiss her. *See generally* Pl. Depo. Tr.—Tran; Pl. Depo Tr.—Aguirre.  A reasonable jury could find that this conduct was sufficiently severe and pervasive to create both an objectively and subjectively hostile work environment. *See, e.g.*, *Carter v. Nat'l R.R. Passenger Corp.*, No. CV 18-9652 PSG (JCX), 2020 WL 2475085, at *6 (C.D. Cal. Jan. 24, 2020) (denying summary judgment on hostile work environment claim premised on race and sex where supervisor used the phrase "black bitches" to refer to plaintiff and others three to four times per week); *Mesa v. Modern Woodmen of Am.*, No. CVF 06-1055 LJO TAG, 2007 WL 3147036, at *9 (E.D. Cal. Oct. 25, 2007) (refusing to grant summary judgment in favor of employer on hostile environment claim where the harasser, for three to five weeks of the harassed employee's twelve-week tenure, called her "beautiful" at least twice a day, stared at her and looked her up and down in a desiring manner, called her his "little [his wife's first name]" several times a week, called her a flirt, "t[o]l[d] her occasionally that she needed five boyfriends," gave her a peck on the cheek and simultaneously brushed her hand, and sometimes stood behind her while she worked); *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 443 (9th Cir. 2017) (finding district court erred in granting summary judgment in favor of employer on sexual harassment hostile work environment claim where the harasser hugged the plaintiff over 100 times over a period of roughly 3 years and hugged female coworkers more than male coworkers, even where the harasser's hugs were

"common" and "cross-gender"); *Borges v. U.S. Bank*, No. 2:12-CV-2427 TLN AC, 2014 WL 530283 (E.D. Cal. Feb. 7, 2014) (denying employer's motion for summary judgment on hostile work environment claim where, from June through November 2011, allegedly harassing manager followed plaintiff into bank vault several times a day, once closing the door and turning off the lights, until the plaintiff complained; would call the plaintiff into his office for coaching sessions during which he called the plaintiff "hot" and complained about his wife; and once, while the plaintiff was walking past, pushed his crotch against her and grunted).  Accordingly, the Court **DENIES** summary judgment in Defendant's favor on this issue.

As genuine disputes of material fact remain as to Plaintiff's claim for hostile work environment harassment, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's second claim.

### B.    Claim 1: Quid Pro Quo Sexual Harassment

"A cause of action for quid pro quo harassment involves the behavior most commonly regarded as sexual harassment, including, e.g., sexual propositions, unwarranted graphic discussion of sexual acts, and commentary on the employee's body and the sexual uses to which it could be put." *Mogilefsky*, 20 Cal. App. 4th at 1414 (citing *Donald Schriver, Inc. v. Fair Emp't & Hous. Comm'n*, 220 Cal. App. 3d 396, 405 (1986)). "To state a cause of action on this theory, is it [sic] sufficient to allege that a term of employment was expressly or impliedly conditioned upon acceptance of a supervisor's unwelcome sexual advances." *Id.* (citing *Bihun v. AT & T Info. Sys., Inc.*, 13 Cal. App. 4th 976, 1005 (1993)).

Defendant asserts that Plaintiff's claim for quid pro quo sexual harassment fails as a matter of law because: (i) Mr. Buenaflor was not a supervisor, and therefore "a tangible employment action could not have been premised on Plaintiff's acquiescence to any sexual demands"; (ii) he never requested sexual favors from Plaintiff; and (iii) Plaintiff never resisted his conduct.  Mot. Mem. at 18.  Plaintiff contends that a genuine dispute of material fact exists because Mr. Buenaflor made sexual advances on Plaintiff by massaging her

shoulders, touching her thigh, calling her pet names, and attempting to kiss her, and her "job was conditioned upon tolerating Buenaflor's sexual advances," as Mr. Buenaflor and his fellow Lead CSAs "began a campaign of targeted harassment against Plaintiff" which necessitated her resignation.   MSJ Opp'n at 19–20.   Defendant argues that Plaintiff's admissions during her deposition "that Buenaflor never requested sexual favors from her, and she never resisted Buenaflor's conduct, are fatal to her claim."   MSJ Reply at 8 (citing Pl. Depo. Tr.—Tran at 36:22–37:11, 51:12–23, 59:5–13, 64:7–20, 70:2–18, 92:23–24). Defendant also contends that "Plaintiff's conclusory assertion that Beunaflor and other Lead CSAs 'began a campaign of targeted harassment against Plaintiff' so she would tolerate Buenaflor's sexual advances is nonsensical and has no support."   *Id.* at 8–9 (footnote omitted).   Further, "(1) Buenaflor did not have authority to condition terms of Plaintiff's employment on acceptance of the alleged conduct, (2) she failed to show that an employment term was conditioned upon acceptance of his conduct, and (3) she never suffered an adverse employment action."   *Id.* at 9 n.11.

For the reasons provided *supra* at Section II.A.1, the Court finds that a reasonable jury could conclude that Mr. Buenaflor was Plaintiff's supervisor for FEHA purposes. Moreover, construing all facts and reasonable inferences in favor of Plaintiff, a reasonable jury also could find that Mr. Buenaflor's conduct constituted unwelcome and actionable conduct of a sexual nature.   And Defendant cites to no authority standing for the proposition that a plaintiff must "resist" her harasser to bring a claim.   *See* Mot. Mem. at 18; MSJ Reply at 8.   Indeed, a treatise states the opposite: "The plaintiff who did not confront the harasser still may establish a quid pro quo claim, however, because the law does not require the harassed employee to have confronted the harasser or notified the employer of the harassment."   Thomson Reuters, California Civil Practice—Employment Litigation § 2:55 (Mar. 2023 update).

However, the Court finds that the record contains insufficient evidence to support a reasonable inference that Plaintiff's continuing employment was conditioned, even implicitly, upon tolerating Mr. Buenaflor's unwelcome sexual advances.   A reasonable

woman in Plaintiff's position would not have believed that her continued employment depended on acquiescing to Mr. Buenaflor's conduct, given that there is no evidence connecting any discussion of Plaintiff's job duties with Mr. Buenaflor's sexual conduct. *See Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1175 (9th Cir. 2003) (finding district court did not err in granting summary judgment in favor of defendant on quid pro quo sexual harassment claim where no such "verbal nexus" was evidenced); *Himaka v. Buddhist Churches of Am.*, 917 F. Supp. 698, 705 (N.D. Cal. 1995) (awarding summary judgment to employer on quid pro quo sexual harassment claim where plaintiff failed to submit evidence of causal connection between defunding of her department and an allegedly sexually harassing phone call); *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007) (finding no quid pro quo harassment where the plaintiff "felt she had to consent if she wanted to keep her job, yet . . . offer[ed] little else to support her contention," and noting that supervisor's comment "I just don't think I can work with you anymore" was merely an unactionable "vague and unsupported allegation"). In short, "[t]he mere fact that [Mr. Buenaflor] was interested in sex generally and desired to have sex with [Plaintiff] is simply not enough." *Holly D.*, 339 F.3d at 1176 (footnote omitted).

Plaintiff asserts that favorable working conditions were contingent on her acceptance of Mr. Buenaflor's sexual advances, given that the harassment she subsequently endured at the hands of Mr. Buenaflor and other Lead CSAs resulted from her reporting of Mr. Buenaflor's harassing behavior. MSJ Opp'n at 20. And during oral argument, Plaintiff's counsel contended that the timeline supports an inference that tolerable working conditions were contingent upon Plaintiff's acceptance of Mr. Buenaflor's advances, as there were acts of sexual hostility beyond the overtly sexual harassment that extended through September 2019. The Court, however, disagrees. Mr. Buenaflor's overt sexual harassment ended in December 2018. Plaintiff first complained about the harassment to a Union representative in February 2019. Then, beginning in May 2019, Mr. Buenaflor and his co-workers joked about reporting nonsexual taps on the back to HR, reassigned Plaintiff several times mid-shift, and mischaracterized one absence in the ensuing months. This

campaign of allegedly retaliatory harassment was both (1) removed in time from Plaintiff's refusal to submit, not starting until roughly five months after the complained-of sexually harassing behavior had ceased; and (2) largely carried out by Mr. Buenaflor's co-worker friends rather than Mr. Buenaflor personally. Plaintiff points to no authority, and the Court is aware of none, holding that unfavorable working conditions so remotely connected to the sexually harassing behavior can constitute quid pro quo harassment.

Ultimately, "the facts fail to show that [Mr. Buenaflor] demanded acquiescence to sexual overtures in exchange for" a job benefit or the absence of a job detriment; instead, the only reasonable inference here is that any retaliation by Mr. Buenaflor and his fellow Lead CSAs was "because [Mr. Buenaflor] was upset by [Plaintiff]'s complaints [rather than any refusal to submit to his sexual advances]." *Rasmusson v. Copeland Lumber Yards, Inc.*, 988 F. Supp. 1294, 1304 (D. Nev. 1997). Thus, "a reasonable jury could not find that [Plaintiff] was subject to Quid Pro Quo discrimination, and summary judgment is appropriate." *Id*. Accordingly, the Court **DISMISSES** Plaintiff's first claim for quid pro quo sexual harassment and **GRANTS** summary judgment in favor of Defendant.

### C.    Claim 3: Disparate Treatment

Under FEHA, "[i]t is an unlawful employment practice . . . [f]or an employer, because of the . . . sex . . . of any person, . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940(a). "The elements of such a [disparate treatment] claim a[re] (1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the discriminatory animus and the adverse action; (5) damage to the employee; and (6) a causal link between the adverse action and the damage." *McCaskey v. Cal. State Auto. Ass'n*, 189 Cal. App. 4th 947, 979 (2010) (citation and internal quotation marks omitted).

An employee raises a presumption of discrimination by presenting a prima facie case. *See Guz v. Bechtel Nat'l Ins.*, 24 Cal. 4th 317, 355 (2000). "The specific elements of

a prima facie case may vary depending on the particular facts," but "[g]enerally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." *Id.* (citations and footnote omitted). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to rebut the presumption of discrimination by producing admissible evidence sufficient to raise a genuine issue of material fact that the complained-of action was taken for a legitimate and nondiscriminatory reason. *Id.* at 355–56 (citations omitted). "If the employer sustains this burden, the presumption of discrimination disappears." *Id.* at 356 (citations omitted). "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." *Id.* (citations omitted). The burden of persuasion remains with the plaintiff. *Id.* (citations omitted).

Defendant first claims that Plaintiff cannot establish a prima facie case of disparate treatment because she suffered no adverse employment action, as she was not constructively discharged from her job. Mot. Mem. at 19–21. Plaintiff counters that Alaska's response to the discrimination was untimely and ineffective, and "in retaliation for her complaint, Plaintiff was continually harassed by Lead CSAs, which Alaska permitted, until her working conditions were so intolerable she had to resign." MSJ Opp'n at 22. Even in the absence of a constructive discharge, "the daily retaliation inflicted on Plaintiff after she reported Buenaflor . . . constitutes an adverse employment action as such acts directly impacted Plaintiff's job performance and prospects for advancement." *Id.* at 23. Alaska contends that "the undisputed evidence does not support a finding that Alaska 'knowingly permitted intolerable working conditions that were so intolerable' that 'a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign'" such that Plaintiff's voluntary resignation amounts to a constructive discharge. MSJ Reply at 9 (quoting *Turner v. Anheuser-Busch, Inc.*, 7 Cal.

4th 1238, 1247–48 (1994) (en banc)).  Rather, "every time Plaintiff raised a concern, including the purported actions of Buenaflor, Vessey and others, Alaska immediately addressed it"; accordingly, Plaintiff did not experience unaddressed "daily retaliation" sufficient to support her claim, either.  *Id.* at 9.

Second, Defendant contends that Plaintiff fails to establish any causal connection between her sex and the purported adverse employment actions—i.e., the subsequent, predominantly non-sexual retaliatory acts of Mr. Buenaflor and other Lead CSAs.  *See* Mot. Mem. at 21–22.  Plaintiff claims a causal connection exists because both Mr. Buenaflor and other Lead CSAs harassed Plaintiff in retaliation for her reports of sexual harassment.  MSJ Opp'n at 23.  Defendant responds that Plaintiff fails to cite "any evidence or case law" to support her claim that the causal nexus "'is clear.'"  MSJ Reply at 10 (footnote omitted).

Construing all the evidence and any reasonable inferences drawn therefrom in the light most favorable to Plaintiff, the Court finds, on the record before it, that Plaintiff has failed to raise a genuine issue of material fact as to the question of whether she experienced an adverse employment action on the basis of her sex, whether that adverse action be a "constructive discharge" or an intolerable campaign of daily retaliation.  Had Mr. Buenaflor's sexually harassing conduct continued until Plaintiff left her position, the outcome very well may have been otherwise; however, the Parties do not dispute that Mr. Buenaflor's overtly sexually harassing conduct—which, as explained *supra* at Section I.A.2, a reasonable jury could infer Defendant knowingly permitted, given its failure to promptly investigate and intervene—abated in December 2018.  Thereafter, no harassing incidents whatsoever occurred from the first of the year until May 2019.  For the same reasons provided *supra* at Section II.C, Plaintiff does not point to any evidence that plausibly ties these remote-in-time and substantively unrelated acts of harassment, such as allegedly improper attempts to reassign her mid-shift, to her sex.  Nor does she provide any evidence tending to show how isolated incidents of allegedly sexually inappropriate behavior by others, occurring in September 2019, were plausibly undertaken in retaliation

for her remote-in-time reports of Mr. Beunaflor's sexual harassment.  Accordingly, beyond the actions giving rise to a hostile work environment addressed *supra* at Section II.A, the Court finds that Plaintiff fails to allege incidents, either individually or collectively, that are sufficiently continuous or aggravating so as to amount to an adverse employment action causally linked to her sex.  Accordingly, the Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's third claim for disparate treatment and **DISMISSES** this claim. *Cf. Alvarado v. FedEx Corp.*, No. C 04-00098 SI, 2006 WL 644875, at *19 (N.D. Cal. Mar. 13, 2006) (finding causal connection due to temporal proximity and many of the alleged adverse actions involving the alleged harasser).

### D.        Claim 4: Failure to Prevent Discrimination, Harassment, and Retaliation

Defendant argues that, because Plaintiff's underlying harassment and discrimination claims fail, her derivative claim for failure to prevent likewise fails.  Mot. Mem. at 22. However, the Court has found that Plaintiff has raised a genuine issue of material fact as to her claim for hostile work environment sexual harassment and thus the claim survives summary judgment.  *See supra* Section II.A.  Further, during oral argument, Defendant's counsel conceded that, should the hostile work environment claim survive summary judgment, Plaintiff's claim for failure to prevent harassment would also survive. Accordingly, the Court **DENIES** summary judgment on Plaintiff's failure-to-prevent claim.

### E.        Claim 5: Negligent Retention

"California case law recognizes the theory that an employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee."  *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996) (citing *Evan F. v. Hughson United Methodist Church*, 8 Cal. App. 4th 828, 836 (1992)).  "Liability is based upon the facts that the employer knew or should have known that hiring[ or retaining] the employee created a particular risk or hazard and that particular harm materializes."  *Id.* (citing *Evan F.*, 8 Cal. App. 4th at 836–37).

/ / /

Defendant first attacks Plaintiff's negligent retention claim on the ground that it purportedly is preempted by the California Workers' Compensation Act ("WCA"). Mot. Mem. at 22–23. Plaintiff contends that her claim is not preempted because "'[n]either discrimination nor harassment is a normal incident of employment.'" MSJ Opp'n at 23 (quoting *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 288 (2009)). Defendant, however, responds that the claim "arose out of and in the course and scope of [Plaintiff's] employment with Alaska," and therefore is barred by the WCA. MSJ Reply at 10 n.14.

"The [WCA] provides an exclusive remedy against employers and preempts civil action for certain injuries." *Bohnert v. Roman Catholic Archbishop of S.F.*, 67 F. Supp. 3d 1091, 1098 (N.D. Cal. 2014) (citing Cal. Lab. Code § 3602). The WCA is a plaintiff's exclusive remedy for injuries resulting from "alleged wrongful conduct . . . [that] occurred at the worksite, in the normal course of the employer-employee relationship." *Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 902 (2008) (citing *Livitsanos v. Superior Court*, 2 Cal. 4th 744, 754 (1992); *Shoemaker v. Myers*, 52 Cal. 3d 1, 25 (1990); *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 160 (1987)). However, "[n]either discrimination nor harassment is a normal incident of employment." *Nazir*, 178 Cal. App. 4th at 288 (citations omitted). Thus, the WCA "does not preempt [causes of action] 'that implicate fundamental public policy considerations,'" including claims for negligent retention that "rest[] on facts supporting [a] claim for gender discrimination [or harassment]." *Muniz v. United Parcel Serv., Inc.*, 731 F. Supp. 2d 961, 976 (N.D. Cal. 2010) (quoting *Maynard v. City of San Jose*, 37 F.3d 1396, 1405 (9th Cir. 1994)).

The Court finds the cases Defendant cites to support its argument of preemption unconvincing. *See* Mot. Mem. at 22–23. *Coit Drapery Cleaners, Inc. v. Sequoia Insurance Co.*, 14 Cal. App. 4th 1595 (1993), is distinguishable from the present case for the reasons stated in *Greenfield v. America West Airlines, Inc.*, No. C03-05183 MHP, 2004 WL 2600135, at *6–8 (N.D. Cal. Nov. 16, 2004)), which found that a claim for negligent supervision premised on the same set of facts as the employee's claim of sexual harassment fell outside the WCA's exclusivity provision. And the two-sentence section of *Haynal v.*

*Target Stores*, No. 96-1599-K(RBB), 1996 WL 806706, at *6 (S.D. Cal. Dec. 19, 1996),

granting a motion to dismiss a negligent infliction of emotional distress claim on the basis

of WCA preemption, does not address the exclusion for claims falling outside the normal

course of the employer-employee relationship.  The weight of authority in the three decades

since those cases were decided favors finding claims such as Plaintiff's exempt from the

WCA's exclusivity provision, and Defendant's counsel conceded as much during oral

argument.  *See, e.g.*, *Greenfield*, 2004 WL 2600135, at *6–8; *Muniz*, 731 F. Supp. 2d at

976 (denying motion for summary judgment on claim for negligent hiring, training, and

supervision premised on gender discrimination); *Tipton v. Airport Terminal Servs., Inc.*,

No. 218CV09503ABJEMX, 2019 WL 3035095, at *5 (C.D. Cal. Apr. 16, 2019) (finding

"workers' compensation does not preempt Plaintiff's negligent hiring, retention, and

supervision claim" premised "on Defendant's failure to take all reasonable steps to prevent

discrimination and harassment"); *Lurie v. Konica Minolta Bus. Solutions U.S.A., Inc.*, No.

CV1600787RGKGJS, 2016 WL 7508183, at *4 (C.D. Cal. Mar. 14, 2016) (refusing to

dismiss claim for negligent hiring, supervision, and retention based on WCA preemption).

Accordingly, the Court finds that the WCA does not preempt Plaintiff's claim as a matter

of law.

      In the alternative, Defendant contends that Plaintiff fails to establish the elements of

a negligent retention claim as a matter of law.  Mot. Mem. at 23.  Specifically, Defendant

claims Plaintiff fails to show that Defendant knew or should have known that Mr.

Buenaflor presented a risk to other employees or that the retention of Mr. Buenaflor was a

substantial factor in causing Plaintiff's alleged harm, given that Defendant first received

any complaint concerning Mr. Buenaflor after his allegedly inappropriate behavior as to

Plaintiff ceased.  *Id.* at 23–24.  However, for the reasons provided *supra* at Section II.A.2,

the Court finds that a genuine issue of material fact exists as to whether Defendant knew

of Mr. Buenaflor's allegedly harassing behavior toward female employees as early as the

summer of 2018, while the sexual harassment of Plaintiff was ongoing, and a reasonable

jury could conclude that Defendant's apparent failure to do anything concerning that

behavior in the intervening seven months was a substantial factor in causing Plaintiff's harm. Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's claim for negligent retention.

### F.   Claim 6: Negligent Infliction of Emotional Distress

First, Defendant contends that Plaintiff's claim for negligent infliction of emotional distress ("NIED") is also preempted by the WCA and hence fails as a matter of law. Mot. Mem. at 24. "But '[w]here a plaintiff's emotional distress claim results from a defendant's misconduct which exceeds the normal risks of the employment relationship, a plaintiff's claim is not preempted by the WCA.'" *Bohnert*, 67 F. Supp. 3d at 1098 (finding NIED claim not preempted by the WCA) (quoting *Evans v. Hard Rock Cafe Int'l (USA), Inc.*, No. 2:07-cv-1074 FCD DAD, 2007 WL 2782775, at *3 (E.D. Cal. Sept. 24, 2007)). Thus, for the reasons provided *supra* at Section II.E, the Court finds that Plaintiff's NIED claim is not preempted as a matter of law by the WCA. *See, e.g.*, *Taylor v. Beth Eden Baptist Church*, 294 F. Supp. 2d 1074, 1080 (N.D. Cal. 2003) (finding WCA exclusivity inapplicable to NIED claim premised on sex discrimination, harassment, and retaliation claims); *Smith v. Int'l Bhd. of Elec. Workers*, 109 Cal. App. 4th 1637, 1658 (2003) (finding NIED claim premised on disability discrimination not preempted).

Second, Defendant asserts that this claim fails on the merits because discrimination or harassment is inherently intentional. Mot. Mem. at 24–25 (citing *Semore v. Pool*, 217 Cal. App. 3d 1087, 1105 (1990)). Plaintiff counters that *Semore* is distinguishable because it "involved [emotional distress stemming from] a termination and not emotional damages resulting from harassment, as here." MSJ Opp'n at 24 (citing *Semore*, 217 Cal. App. 3d at 1092). The Court agrees that *Semore* is distinguishable on this basis. *See Semore*, 217 Cal. App. 3d at 1103–05. Moreover, even accepting for purposes of Defendant's argument that Mr. Buenaflor's acts of harassment were "inherently intentional," Plaintiff accuses Defendant of negligently failing to intervene in said intentional acts. *See, e.g.*, Compl. ¶ 76 ("Defendants were negligent in that they knew, or should have known, that Mr. Buenaflor[] was engaging in the conduct heretofore described, but failed to intervene on Plaintiff's

behalf."). That other courts have permitted NIED claims premised on sexual harassment and discrimination to proceed against employers underscores that such claims are cognizable and not per se barred because of the "inherently intentional" nature of harassment. *See, e.g.*, *Garcia v. Nat'l Oilwell Varco, L.P.*, No. SACV141275CJCRNBX, 2016 WL 11743396, at *5 (C.D. Cal. Nov. 15, 2016) (finding NIED claim against employer for failure to prevent workplace harassment survived summary judgment); *Hong v. Right Mgmt. Consultants, Inc.*, No. C 04-4011 PJH, 2006 WL 335291, at *17 (N.D. Cal. Feb. 14, 2006) (same); *Bohnert*, 136 F. Supp. 3d at 1123 (same). Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's NIED claim.

### G.   *Claim 7: Wrongful Termination*

Defendant asserts that "Plaintiff's wrongful termination claim is entirely derivative of her discrimination claim"; thus, because the discrimination claim fails as a matter of law, so too does her wrongful termination claim. Mot. Mem. at 25. In her Opposition, Plaintiff only argues that Defendant's argument lacks merit because her discrimination claim should survive summary judgment. MSJ Opp'n at 24. During oral argument, however, Plaintiff's counsel disagreed with the premise that Plaintiff's wrongful termination claim is dependent on her discrimination claim, contending that, so long as the Court finds that Plaintiff was constructively discharged, the claim could survive on the basis of Plaintiff's hostile work environment claim and the public policy underlying it. The Court agrees that Plaintiff's claim does not rise or fall with her disparate treatment claim; nonetheless, the Court finds that Plaintiff's claim fails as a matter of law.

"Wrongful termination in violation of public policy is a California common law cause of action providing that 'when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions.'" *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1024 (N.D. Cal. 2012) (citing *Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167 (1980); *Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir. 2003)). "Constructive discharge occurs when the employer's conduct effectively forces an

employee to resign." *Turner*, 7 Cal. 4th at 1244. "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Id.* at 1251. "For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." *Id.*

While it is true that Plaintiff's claim does not depend on her stating a viable claim for discrimination or harassment, *see, e.g.*, *Tichenor v. BAE Sys. Tech. Solutions & Servs., Inc.*, No. 20CV499 JM (BGS), 2021 WL 3080040 (S.D. Cal. July 21, 2021) (finding standalone claim for constructive discharge could proceed where underlying claims of discrimination, harassment, and retaliation were time-barred), it is likewise true that the mere existence of conduct that is discriminatory or harassing does not establish a constructive  discharge, *see, e.g.*, *Cloud v. Casey*, 76 Cal. App. 4th 895, 905 (1999) ("Gender discrimination in employment is unlawful, and actionable.  The question here, however, is not whether there was such discrimination, but whether the discriminatory working conditions were so extreme as to coerce a reasonable employee to resign[.]"). "The mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee." *Turner*, 7 Cal. 4th at 1254. Rather, "[t]he conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Id.* at 1246. Further, "remote[ness] [of] time and context" between the commencement of the purportedly unbearable conditions and the resignation is significant to the determination of whether a reasonable employee would find the conditions "intolerable." *Id.* at 1255 (footnote omitted).

Here, Plaintiff resigned her employment on January 29, 2020.  Pl. Depo. Tr.—Tran at 244:25–45:14; Aguirre Decl. Ex. 11.  Mr. Buenaflor's sexually harassing behavior commenced in April 2018 and ended in December 2018, more than a full year prior to the termination of Plaintiff's employment.  Pl. Depo. Tr.—Tran at 35:13–23, 37:12–17, 38:21–24, 39:18–21, 49:20–50:23, 54:9–16, 60:17–25, 67:3–68:5, 69:19–70:1.  And the allegedly retaliatory conduct that followed commenced in May 2019 and ended sometime around September 27, 2019, a full four months prior to Plaintiff's resignation.  Pl. Depo. Tr.—Aguirre at 71:21–72:15; Pl. Depo. Tr.—Tran at 76:3–77:15.  Taking into consideration the totality of the circumstances and viewing all facts and inferences in Plaintiff's favor, the Court concludes that no reasonable employee would find the conditions of employment "intolerable" as of January 2020, when Plaintiff ended her employment with Defendant.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's claim for wrongful termination and **DISMISSES** the claim from this action.

### H.  Punitive Damages

In California, an award of punitive damages can only be obtained "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).  Moreover, an employer can only be liable for punitive damages based upon the acts of an employee if it

> had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct . . . .  With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, [or] ratification . . . must be on the part of an officer, director, or managing agent of the corporation.

*Id.* § 3294(b).  "This higher clear and convincing evidentiary standard applies at every stage of the litigation process, including summary adjudication."  *Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002) (citing *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1121 (2001)).

/ / /

To the extent any of Plaintiff's claims survive, Defendant contends that her request for punitive damages should be dismissed, as "[t]he undisputed facts establish that Buenaflor was not a supervisor, let alone a managing agent of Alaska." Mot Mem. at 25. Plaintiff contends that "Alaska has not shown that . . . Lead CSAs[] are not 'managing agents.'" MSJ Opp'n at 25 (citation omitted). Plaintiff also argues that "Alaska upper management adopted Buenaflor's conduct, and allowed him and others to harass Plaintiff until she resigned. Director of Station Operations Ceron, to whom Plaintiff reported her harassment, holds Alaska's highest position in the San Diego Airport and had substantial authority over the entire location." *Id.* (citation omitted). According to Plaintiff, Alaska also has failed to show that Ms. Ceron was not a "managing agent." *Id.* (citation omitted). Defendant, however, claims that "[t]he undisputed facts establish that neither Buenaflor nor Julie Ceron were managing agents of Alaska." MSJ Reply at 10 (citing Ceron Decl. ¶¶ 4–5) (footnote omitted).

During oral argument and at Defendant's request, the Court granted Defendant an opportunity to file a supplemental brief to submit additional authorities to support its contention that Mr. Buenaflor and Ms. Ceron were not "managing agents" capable of subjecting Alaska to liability for punitive damages and granted Plaintiff an opportunity to respond. *See* ECF No. 52. Plaintiff objects to much of Defendant's Supplemental Briefing on the ground that it exceeds the scope of the ordered briefing and circumvents the five-page limit by utilizing extensive footnotes. *See generally* Supp. Br. Obj. The Court does not find Defendant's liberal use of footnotes particularly offensive; however, Defendant's Supplemental Briefing does argue for the first time that Plaintiff fails to allege any "fraudulent, malicious, or oppressive conduct" either personally committed or ratified by Ms. Ceron sufficient to subject Alaska to liability for punitive damages. *See generally* Def.'s Supp. Br. Generally, issues raised for the first time during oral argument are considered untimely and waived, and courts decline to consider them. *See, e.g.*, *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008); *Rice Corp. v. Grain Bd. of Iraq*, 582 F. Supp. 2d 1309, 1313 (E.D. Cal. 2008); *Animal Prot. & Rescue League v. City of San Diego*, 237 Cal.

App. 4th 99, 107 n.5 (2015).  Further, Defendant's arguments concerning Mr. Buenaflor's allegedly continuing harassment and Alaska's adequate handling of Plaintiff's complaints appear to support that new argument.  Accordingly, to the extent Plaintiff objects to this "new" line of argument, the Court **SUSTAINS** Plaintiff's Objection and declines to address the argument on the merits.  Thus, the Court considers only the "managing agent" issue and the authorities Defendant cites in support.

In analyzing the meaning of "managing agent," the California Supreme Court "note[d] that section 3294, subdivision (b), placed th[e] term 'managing agent' next to the terms 'officer' and director,' intending that a managing agent be more than a mere supervisory employee.  The managing agent must be someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999).  The Supreme Court cited with approval *Kelly-Zurian*, 22 Cal. App. 4th at 421–22, a case involving sexual harassment by a supervisory employee, where the Court of Appeal found the plaintiff was not entitled to recover punitive damages because the supervisor was not a "managing agent." *White*, 21 Cal. 4th at 573–74.  In *Kelly-Zurian*, the Court of Appeal found that, "[a]lthough [the corporate defendant] does not dispute [the plaintiff]'s assertion there was no one in a superior position to [the harassing employee] in Southern California, the evidence is clear [the harassing employee] was not a managing agent." 22 Cal. App. 4th at 421.  "Not only did [the plaintiff] fail to present any evidence to show [the harassing employee] was in a policy making position, but [the corporate defendant] presented substantial evidence to the contrary." *Id.* at 422.  The defendant's evidence showed that all decisions concerning establishing or changing business policies, salaries, and employee reviews were administered by the corporate headquarters in St. Louis; thus, while the harasser supervised the plaintiff's performance and could advise the St. Louis office and make recommendations, "the uncontroverted evidence established [the harassing employee] was not in a policy-making position and therefore was not a managing agent for [the corporate defendant]." *Id.*

1
2
3
4
5
6
7

During oral argument, Defendant conceded that

> [i]n moving for summary adjudication on the punitive damages
> issue, [Defendant] ha[s] the initial burden of production to make
> a prima facie showing of the nonexistence of any triable issue of
> material fact.  Accordingly, [Defendant] ha[s] the initial burden
> to produce sufficient evidence to make a prima facie showing
> that there were no triable issues regarding whether [its employees
> involved in the incident at issue] were managing agents of
> [Defendant].

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358, 369 (2013).  Defendant has met this burden as to Mr. Buenaflor; although genuine issues of material fact remain as to whether Mr. Buenaflor may have been a "supervisor" for purposes of FEHA, Defendant has offered sufficient evidence of the limited authority exercised by Lead CSAs that the Court finds, as a matter of law, that Mr. Buenaflor was not "someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." *White*, 21 Cal. 4th at 573; *see also* Zwerin Decl. Ex. M at Art. 2.C ("Except as provided in Article 4.E // management and other employees will not perform work in the classifications as set forth in Article 4 [including, *inter alia*, CSAs and Lead CSAs]."); *id.* at Art. 3.C ("The right to hire, promote, discharge or discipline for cause and to maintain discipline and efficiency of employees is the sole responsibility of the Company . . . .  [T]he general operation and direction of the Company and its employees are the sole and exclusive function and responsibility of the Company."); *id.* at Art. 4.E ("Management personnel not covered by this Agreement will predominantly perform supervisory duties but may assist employees with the performance of their duties.").  Plaintiff, whose counsel admitted during oral argument that the evidence on this point was "weak," has not offered evidence sufficient to rebut that put forward by Defendant, and no reasonable jury, based on the evidence in the record, could find that Mr. Buenaflor was a "managing agent."

26
27
28

However, based on the evidence in the record, there remains a dispute of material fact as to whether Ms. Ceron, Alaska's Director of Station Operations at the San Diego Station, is a "managing agent" of Alaska.  Ms. Ceron declares that she "ha[s] no authority

to determine corporate policy," *see* Ceron Decl. ¶ 4, but, as Plaintiff notes, merely parroting a statement of the relevant legal standard is not "evidence," *see Davis*, 220 Cal. App. 4th at 369 ("[The employer] cannot satisfy its initial burden of production of *evidence* by making a conclusory statement of *law*, whether directly or through a declaration of one of its employees (e.g., [the alleged managing agent]).  [The employer] had the initial burden to produce sufficient *evidence* to make a prima facie showing that there was no triable issue regarding whether [the alleged managing agent] was a managing agent of [the employer]. We conclude [the employer], by simply restating the applicable legal standard under *White* for the determination of whether [the alleged managing agent] was its managing agent, did not satisfy its initial burden of production." (emphases in original)).

Further, "[m]anaging agents are not limited to those individuals with the ability to set handbook policies."  *Colucci v. T-Mobile USA, Inc.*, 48 Cal. App. 5th 442, 453 (2020) (collecting cases).   Someone who "formulate[s] operational policies through h[er] discretionary decisions" can also be a "managing agent."  *Id.* at 454 (citing *White*, 21 Cal. 4th at 577).  Ms. Ceron's declaration is devoid of a description of her job duties to evidence her lack of discretionary authority over matters concerning corporate or operational policy, only indicating that she holds the highest position of three levels of management at Alaska's San Diego Station.  Ceron Decl. ¶ 4.  Meanwhile, other evidence in the record establishes that Ms. Ceron would be the individual who "almost always" made decisions to terminate probationary CSAs at the San Diego Station during the time of Ms. Tijerina's employment.  PMK Depo. Tr.—Tran at 78:10–79:15.  Thus, even accepting that Ms. Ceron was not responsible for "determin[ing] corporate policy," Ceron Decl. ¶ 4, based on her level of management and supervisory responsibility, a reasonable juror could conclude that Ms. Ceron was someone with substantial discretionary authority over issues concerning the administration of corporate and operational policy at the San Diego Station.

The cases Defendant cites in its Supplemental Briefing do not alter the foregoing analysis.  As an initial matter, *Muniz*, 731 F. Supp. 2d at 976–77; *Almaweri v. Walgreen Specialty Pharmacy, LLC*, Case No. 13-cv-04920-EDL, 2015 WL 349158, at *11 (N.D.

Cal. Jan. 26, 2015); and *Cortez v. Chipotle Mexican Grill, Inc.*, Case No. CV 17-4787-GW(JPRx), 2018 WL 6071093, at *16 (C.D. Cal. Aug. 9, 2018), appear to put the onus on the plaintiff to show that the purported managing agent has discretion in determining corporate policies; however, as Defendant's counsel conceded at oral argument, it is Defendant, as the movant, who has the initial burden to produce evidence that there are no triable issues as to whether Ms. Ceron is a managing agent. *See Davis*, 220 Cal. App. 4th at 369. *Razo v. TIMEC Company, Inc.*, Case No. 15-cv-03414-MEJ, 2017 WL 5079249, at *15–16 (N.D. Cal. Nov. 3, 2017), acknowledges that the burden of production is the employer's, but determines that the employer there satisfied its burden via declarations setting forth the job duties and decision-making roles of the alleged managing agents. The court then went on to find that the plaintiff failed to bring forth sufficient evidence to rebut the employer's showing and create a triable issue. *Id.* at *16–19. Here, however, the Court has determined that Defendant has not met its initial burden given the conclusory nature of the statements in Ms. Ceron's declaration. *See generally* Ceron Decl.

Ultimately, "[t]he scope of a corporate employee's discretion and authority under [the managing agent] test is . . . a question of fact for decision on a case-by-case basis," *White*, 21 Cal. 4th at 567, and the cases Defendant cites are distinguishable from the instant case. For instance, *Cortez* involved a restaurant manager who oversaw only 0.375% of the employer's restaurants and 0.363% of its employees, 2018 WL 6071093, at *16, and *Almaweri* involved a district manager who was responsible for overseeing just 0.41% of the defendant's more than 8,000 nationwide stores, 2015 WL 349158, at *11. In *Muniz*, the purported managing agent, a district operations manager, oversaw six divisions where, "[o]rganizationally, UPS is divided into Regions, which are subdivided into Districts. Districts are then split into Divisions, which are comprised of Centers." 731 F. Supp. 2d at 963 n.1, 976. Here, Defendant notes in passing that "Alaska serves more than 115 destinations with nearly 1,200 daily flights in the United States, Mexico, Canada and Costa Rica." Def.'s Supp. Br. at 5 n.3. However, Defendant fails to provide any information about the relative importance of the San Diego Station, and the information publicly

available on Alaska's website suggests that the San Diego Station is a station of more than average importance to Alaska's operations.[8]  And, as noted *supra*, the employer in *Razo* submitted detailed declarations concerning the job responsibilities of the relevant personnel and their policy-making authority that are lacking here.  2017 WL 5079249, at *15–19.

Construing all facts and reasonable inferences in Plaintiff's favor and given Defendant's failure to make a prima facie showing of the absence of a dispute of material fact as to whether Ms. Ceron was a managing agent, the Court concludes that it cannot dispose of Plaintiff's request for punitive damages as a matter of law.  Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's request for punitive damages.  *See Villareal v. Chubb & Son, Inc.*, No. SACV 11-0674 DOC, 2012 WL 3151254, at *11 (C.D. Cal. July 31, 2012) ("The analysis of whether an employee is a managing agent is a *fact*-intensive inquiry, and Defendants have only provided this Court with what are essentially legal conclusions.  The Court does not have enough information about each supervisor's job responsibilities to determine that, as a matter of law, any of the supervisors is a managing agent.  Although at trial Plaintiff will bear the burden of proving that the supervisors are managing agents, this is not Plaintiff's motion for summary judgment.  At this stage, it is Defendants' burden to demonstrate that judgment as a matter of law is appropriate.  They have not met that burden." (internal citation omitted) (emphasis in original)).

## CONCLUSION AND ORDERS

In light of the foregoing, the Court **OVERRULES WITHOUT PREJUDICE** Plaintiff's Evidentiary Objections (ECF No. 38-7) and Defendant's Evidentiary Objections (ECF No. 43-1), with the exception of Defendant's objections to Plaintiff's characterization of evidence, which the Court **OVERRULES** on the merits.  Further, the Court **GRANTS**

---

[8] *See, e.g.*, *Network*, ALASKA AIRLINES, available at https://news.alaskaair.com/network/ (last updated Jan. 2020) (noting that, beyond its home base and four "hubs," San Diego is one of two "[o]ther focus cities" and has the fifth highest average daily departure rate at 48 flights, even when compared against amalgamations of multiple regional airports, including "the Bay area" and "Los Angeles").

**IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment (ECF No. 34).  Specifically, the Court **GRANTS** the Motion as to Plaintiff's claims for quid pro quo sexual harassment (claim 1), disparate treatment (claim 3), and wrongful termination (claim 7).  The Court **DENIES** the Motion as to Plaintiff's claims for hostile work environment (claim 2); failure to prevent harassment, discrimination, and retaliation (claim 4); negligent retention (claim 5); and negligent infliction of emotional distress (claim 6); as well as Plaintiff's request for punitive damages.  Finally, the Court **SUSTAINS** Plaintiff's Objection to Defendant's Supplemental Briefing (ECF No. 57).

At the request of both Parties, the Court previously vacated all pretrial dates and deadlines, including the Final Pretrial Conference, pending issuance of the Court's decision on Defendant's Motion for Summary Judgment.  *See* ECF No. 54.  Now that the Court has issued said decision, the Court **SETS** the following revised schedule of pretrial dates and deadlines:

| Event | Deadline |
|---|---|
| Memoranda of contentions of fact and law and any other action required by Civil Local Rule 16.1(f)(2) | July 13, 2023 |
| Comply with pretrial disclosure requirements of Federal Rule of Civil Procedure 26(a)(3) | July 13, 2023 |
| Meet and take any action required by Civil Local Rule 16.1(f)(4) | July 20, 2023 |
| Plaintiff to provide opposing counsel with proposed pretrial order for review and approval | July 27, 2023 |
| Lodge Proposed Final Pretrial Conference Order with the Court | August 3, 2023 |
| Final Pretrial Conference | August 10, 2023, at 1:30 p.m. |

**IT IS SO ORDERED.**

Dated:  June 28, 2023

Hon. Janis L. Sammartino
United States District Judge